Joan GRONOWSKI, Plaintiff–Appellee,

v.

John D. SPENCER, Mayor of the City of Yonkers, sued in his individual capacity, and City of Yonkers, Defendants–Appellants.

Docket No. 04–2605–CV.

United States Court of Appeals, Second Circuit.

Argued Feb. 1, 2005.

Decided Sept. 20, 2005.

Kevin J. Plunkett, White Plains, New York (Kerry Ford Cunningham, Thacher Proffitt & Wood LLP, White Plains, New York, of counsel), for Defendants–Appellants.

Stephen Bergstein, Chester, New York (Christopher D. Watkins, Thornton, Bergstein & Ullrich, LLP, Chester, New York, of counsel), for Plaintiff–Appellee.

Before: WALKER, Chief Judge, CARDAMONE, Circuit Judge, and OWEN *, District Judge.

Judge OWEN dissents in a separate opinion.

CARDAMONE, Circuit Judge.

Defendant Mayor John D. Spencer of the City of Yonkers, New York (Mayor Spencer or Mayor), in his individual capacity, and defendant the City of Yonkers (City) (collectively, defendants or appellants) appeal from a judgment entered on April 6, 2004 in the United States District Court for the Southern District of New York (McMahon, J.), following a jury verdict for plaintiff Joan Gronowski in her action brought against defendants under

* Hon. Richard Owen, United States District Court for the Southern District of New York, sitting by designation.

42 U.S.C. § 1983. The jury found Mayor Spencer violated Gronowski's First Amendment rights by terminating her position in city government in retaliation for her political support of Sam Borrelli, a rival to the Mayor, and imposed liability on the City as well. The jury awarded plaintiff $75,000 in compensatory damages. Defendants also appeal from an order entered April 5, 2004 awarding plaintiff attorneys' fees in the sum of $54,383.75 and costs of $2,189.00.

Defendants' principal argument is that the jury's verdict is unsupported by sufficient evidence. They ask us to reverse the verdict and the judgment entered upon it and to grant judgment as a matter of law in defendants' favor. An elected chief executive of a municipality may think that city employees owe him a measure of personal loyalty above and beyond their obligation to perform their municipal assignments in a diligent, timely, and careful manner. We do not think, however, that a person accepting a civil service appointment in local government thereby checks her constitutional rights at the door and foregoes her right to speak out on matters of public concern. For the reasons set forth below, we affirm the verdict and judgment of the district court.

## BACKGROUND

### A. *Gronowski's Employment and Political Activities*

Joan Gronowski worked for the City of Yonkers in various positions for nearly 30 years. She began employment with the City at an entry level job in the former mayor's office, working there from 1968 until 1976 and returning briefly in 1979. In 1984 plaintiff began a new position in city government as a secretarial assistant in the same office. Three years later, she was promoted to the Chief Clerk position in the Office of Consumer Protection (Consumer Protection) where she remained until she was laid off on June 30, 2000. Consumer Protection was part of a department managed by Frank McGovern during the latter portion of Gronowski's employment there.

As a Chief Clerk, Gronowski's duties included administering the City's licensing function, resolving citizen complaints regarding licensed businesses, and implementing the City's weights-and-measures program. As Consumer Protection grew, so did plaintiff's responsibilities. For example, at the beginning of her tenure, Gronowski was responsible for coordinating the issuance and monitoring of nine City licenses. These tasks largely involved assessing a business's eligibility for a particular license. Over the years the City increased the number of available licenses to 24 without adding staff to assist plaintiff with the expanded workload.

In September 1995, several years after her promotion to Chief Clerk, Gronowski began campaigning with City Council candidate Borrelli, a Democrat seeking the City Council seat once held by Mayor Spencer. At the time, Spencer was running for mayor, a position to which he was elected that fall. By 1997 Gronowski served as third vice chair of the Yonkers Democratic Party and also as Borrelli's campaign treasurer. Although Gronowski advised Mayor Spencer of her political involvement to ensure compliance with the City's prohibition against employees having a policy-making role in a political party, she never received a response. She testified that during this time, McGovern called her to his office and warned her about her involvement with the Democratic Party: "He strongly advised me against being as visible as I was becoming" and told her that she "was asking for trouble." At these encounters Gronowski responded by asserting her right to campaign. She

had no direct confrontation with Mayor Spencer, although she testified that, beginning in 1997, he acted more aloof towards her than he had previously.

In 1999 Gronowski campaigned for Borrelli's unsuccessful attempt to win the Democratic nomination for mayor. His sole opponent in the primary, Margaret Mary Mulrooney, later lost to Mayor Spencer, the incumbent in the general election. During the primary McGovern again called Gronowski to his office and issued several warnings regarding her campaign activities. Gronowski testified that McGovern told her that he spent time with the Mayor and that the Mayor was "furious" with her activities. A union official, Angelo Arena, testified that Gronowski complained to him that McGovern told her to cease her political activities "because it was going to come back and hurt her." Additionally, Gronowski's co-worker in Consumer Protection, Michael Paulercio, testified that plaintiff told him about McGovern's warnings sometime after her involvement with Borrelli's 1999 campaign. Although McGovern denied having said to Gronowski that the Mayor was furious, he admitted he told her to "stay out" of politics, and that her political involvement was "not a smart thing to do."

### B. *The Layoff Process*

Because the City of Yonkers faced budgetary concerns, in 2000 the Mayor instructed Ernest Hart, the City's commissioner of personnel, and James LaPerche, the City's commissioner of finance (collectively, commissioners), to discuss ways to eliminate positions in the City government. Hart testified that, in their decision-making, the two were guided by a study that concluded Yonkers had too many provisional workers. Nonetheless, the commissioners chose not to follow the recommendations of the study, which suggested reclassification and consolidation of titles rather than layoffs. Instead, the commissioners planned to eliminate all four Chief Clerks, along with 29 other City positions. During their discussions, Gronowski's name was mentioned, along with the other employees who would be laid off. Hart further testified that he wanted to eliminate the Chief Clerk positions because their job duties were redundant, but he admitted that he did not know the extent of Gronowski's day-to-day responsibilities. He was unaware, in addition, of plaintiff's civil service rights and thus did not know whether she would be retained by the City following the layoffs.

Commissioner Hart testified that he did not know who Gronowski was at the time he recommended the elimination of her Chief Clerk title. Commissioner LaPerche, however, knew Gronowski and of her support for Borrelli. Indeed, LaPerche testified that it was general knowledge at City Hall that Gronowski was actively involved in Borrelli's campaign for mayor in the 1999 Democratic primary. Nonetheless, LaPerche testified that Mayor Spencer did not tell him or Commissioner Hart to consider political affiliations of the employees, and no one personally directed them to fire Gronowski. The Mayor did, however, convey his unhappiness with Consumer Protection in his discussions with Commissioner Hart.

At a meeting with the Mayor prior to the layoffs, the commissioners proposed eliminating the Chief Clerk positions, along with several other managerial positions. Because the mayor has the ultimate authority over municipal employment decisions in the City of Yonkers, it was the Mayor who, after receiving the commissioners' proposed layoffs, sanctioned the layoffs by approving the list of individuals who would lose their positions.

On June 27, 2000 Gronowski was informed by letter that her position was to be eliminated effective as of July 1, 2000. She testified that McGovern called her into his office on her last day of work and said: "I'm so sorry that this happened to you. If I could have I would have blindfolded you and tied your hands behind your back so you wouldn't have worked for Sam Borrelli and this wouldn't have happened to you."

## C. *The Reversal of the Layoffs*

Despite a contract requiring the City to confer with the union regarding layoffs, no negotiations between the two entities ever took place. Gronowski, as well as other union members, shared with Arena their opinions that the Mayor was targeting people to be laid off for political reasons under the guise of fiscally motivated retrenchment. Arena expressed outrage to Commissioner Hart that permanent employees had been laid off while provisional employees were retained. Arena then met with the Mayor and discussed the reinstatement of 15 employees, including Gronowski. Under union pressure, the Mayor issued a directive in the summer of 2000 to find "vacant positions" for laid-off employees.

Through several discussions with his advisors, the Mayor was involved in reversing the layoffs and had responsibility for where employees were placed. Most of the employees, including two Chief Clerks, returned to their original positions, but Gronowski and at least two others actively involved in politics in opposition to Mayor Spencer were not offered positions in their original departments. Aside from Gronowski, only three other permanent employees did not return to work in any capacity for the City.

The three other Chief Clerks never left City employment. LaPerche arranged for the Chief Clerk in the Parks Department to remain in that department without missing a day of work despite his change of title from Chief Clerk, and despite his being originally transferred to a different position. The Chief Clerk in the Fire Department, Eva Nowak, was moved to the centralized purchasing department and was kept on the payroll with her salary fully restored. However, Nowak was entitled to "bumping rights" which meant she could displace a person with less seniority. The Chief Clerk of the Housing and Buildings Department had a position exempt from civil service requirements, and was thus able to stay in her department in a position free from civil service restrictions, and suffered only a temporary pay cut.

The union attempted to place plaintiff in a similar position where she would be immune from civil service restrictions. Arena also testified that he was surprised that Gronowski was not reinstated in her old position and asked for an explanation. He was told by the Personnel Department that the City had the right to reorganize and put titles and people where they felt they were needed.

Meanwhile, the City hired other employees to handle Gronowski's old duties in Consumer Protection. Indeed, the replacement employees called Gronowski at home to receive advice on fulfilling the job requirements. Despite this, Hart did not discuss the current needs of Consumer Protection with McGovern, nor did he ask who was completing Gronowski's old tasks.

Even though there existed an agreement between the union and the Mayor that people would be returned to their original positions, Commissioner LaPerche never contacted Gronowski's superiors about giving Gronowski her job back. Further, no legal impediment prevented Personnel officials from exercising their budgetary discretion to reinstate Gronowski in her for-

mer department, as they had done with numerous other City employees. After the layoffs, Gronowski inquired as to reinstatement in her former department but never received a response. Through her inquiries, however, she discovered that the City had hired additional people, including the Mayor's son, despite the budget crisis. She also learned that the City had hired several friends and relatives of McGovern, himself a friend of the Mayor, to work in her old department. The City eventually directed four different individuals to fulfill Gronowski's former job responsibilities. Three of these four people were McGovern's girlfriend and two of her relatives.

While the other three Chief Clerks were kept on the payroll, Gronowski was not contacted until September 2000, a few months after her layoff, for a job in the Parks Department. Gronowski did not take the position offered to her in that department because she could not timely obtain an adequate job description and because the supervisor of the position expressed dismay that Gronowski was not adequately trained. Although Gronowski finally received a letter outlining her new grade and salary, it was on the day she was instructed to report for work, September 25, 2000. The letter also stated that she would be taken off the preferential hiring list for the City if she did not show up on that day. At the time, Gronowski did not know that she had another 30 days in which to accept the assignment, so she assumed it was too late and never reported to work.

Because Gronowski did not accept this position, she was removed from the City's preferential list. The New York State Civil Service Code, however, requires that before an employee be removed from this list, she must be given reasonable notice of the new job and that the job must be an equivalent position. Pursuant to her rights under the Code, Gronowski petitioned for reinstatement to the list, but received no response.

### D. *Proceedings Below*

On November 3, 2000 Gronowski filed a complaint in the Southern District of New York alleging that Mayor Spencer terminated her from her position as Chief Clerk in retaliation for her political support of Borrelli, thereby violating her First Amendment rights. The case was tried before a jury, which returned a verdict for plaintiff on March 10, 2004, and awarded her $75,000 in compensatory damages. At the close of plaintiff's case, defendants sought a directed verdict under Fed. R.Civ.P. 50, on grounds that plaintiff failed to sustain her burden of proof, which the district court denied. It then entered final judgment holding defendants liable under § 1983 and awarded plaintiff compensatory damages, as well as attorneys' fees and costs. Following the judgment, defendants renewed their Rule 50 motion and the motion was again denied because the district court ruled there was sufficient evidence in the record to support the jury's verdict. This appeal, in which defendants seek reversal of the judgment, followed.

### DISCUSSION

#### I  Standard of Review

Appellants contend the evidence was insufficient to support a finding of retaliation in violation of the First Amendment and that the district court's judgment and jury's verdict must therefore be reversed. In reviewing the sufficiency of the evidence in support of a jury's verdict, we examine the evidence in the light most favorable to the party in whose favor the jury decided, drawing all reasonable inferences in the winning party's favor. *Nor-*

*ton v. Sam's Club,* 145 F.3d 114, 118 (2d Cir.1998). In so doing, we cannot weigh conflicting evidence, determine the credibility of witnesses, or substitute our judgment for that of the jury. *Id.; Stratton v. Dep't for the Aging,* 132 F.3d 869, 878 (2d Cir.1997).

█ While we review the entire record, we cannot consider evidence favorable to appellant that the jury need not have believed. That is, we must disregard contradicted evidence and testimony from impeached and interested witnesses that supports appellants. *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 151, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). We will overturn a verdict only if there is " 'such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or such an overwhelming amount of evidence in favor of the [appellant] that reasonable and fair minded men could not arrive at a verdict against [the appellant].' " *LeBlanc–Sternberg v. Fletcher,* 67 F.3d 412, 429 (2d Cir. 1995) (quoting *Song v. Ives Laboratories, Inc.,* 957 F.2d 1041, 1046 (2d Cir.1992)).

We recognize that this is a close case and, had we sat as the factfinder, we might well have found in favor of the defendants. As an appellate court, however, it is not our task to retry the case or reweigh the evidence. Because of the limits on our review of a trial court's factual determinations, parties asking this Court to upset a jury verdict bear a heavy burden to obtain such relief. The Mayor and the City have not met that burden.

## II  Sufficiency of the Evidence

### A. *Individual Liability of Mayor Spencer*

#### 1. *Applicable Law*

█ Gronowski asserts that the Mayor violated her rights under the First Amendment by terminating her from City employment on account of her political activity. Several requirements must be met for a plaintiff, such as the one before us, to establish a claim that her dismissal as a public employee from government service was retaliation arising from the exercise of her First Amendment rights. Plaintiff must show: (1) her speech was constitutionally protected, as a result of which (2) she suffered an adverse employment decision, and (3) a causal connection existed between the speech and the adverse employment decision, so that it can be said that her speech was the motivating factor in the determination. *Morris v. Lindau,* 196 F.3d 102, 110 (2d Cir.1999); *see also Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 283–87, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977). That is to say, to prevail on a First Amendment retaliation claim, a public employee must demonstrate that her speech addressed a matter of public concern, and that such protected speech substantially motivated the adverse action. *Feingold v. State of New York,* 366 F.3d 138, 160 (2d Cir.2004). A court must examine the whole record to resolve, as a question of law from the context of a given statement, whether it addresses a matter of public concern. Plainly, political speech is a matter of public concern and is constitutionally protected. *Id.*

█ A public employee generally may not be dismissed on account of her party affiliation, because such action violates the employee's First Amendment rights absent a showing that "party affiliation is an appropriate requirement for the effective performance of the public office involved." *Branti v. Finkel,* 445 U.S. 507, 518, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980); *Coogan v. Smyers,* 134 F.3d 479, 483 (2d Cir.1998). Gronowski engaged in activity protected

under the First Amendment when she supported Borrelli's political campaigns, and the Mayor and the City do not assert that party affiliation is pertinent to the Chief Clerk position from which Gronowski was fired. Appellants also do not dispute that Gronowski suffered an adverse action when she lost her job in the City's Consumer Protection Office. Instead, appellants argue that there was insufficient evidence from which the jury could have reasonably found a causal link between Gronowski's protected activity and her loss of employment. Specifically, defendants declare that the evidence does not suggest the Mayor was personally involved in a violation of Gronowski's constitutional rights.

Before § 1983 damages are awarded, a plaintiff must show by a preponderance of the evidence that the defendant was personally involved—that is, he directly participated—in the alleged constitutional deprivations. " '[D]irect participation' as a basis of liability in this context requires intentional participation in the conduct constituting a violation of the victim's rights by one who knew of the facts rendering it illegal." *Provost v. City of Newburgh,* 262 F.3d 146, 155 (2d Cir.2001). In a retaliation case, an employer's state of mind is necessarily at issue. In making its determination, the jury is permitted, of course, to rely on circumstantial evidence to support the required inference of retaliatory intent. *Morris,* 196 F.3d at 110. And, to assert, as the dissent does, that the Mayor was not involved in Gronowski's alleged constitutional deprivation seems an implicit rejection of this principle of law.

### 2. The Mayor's Involvement in the Adverse Employment Actions

Applying the foregoing standard, we examine the facts pertinent to the Mayor's liability in the light most favorable to Gronowski. We conclude that sufficient evidence existed for the jury reasonably to find that the Mayor was involved in the action adversely affecting Gronowski and that this involvement was precipitated by the Mayor's dislike for Gronowski's political activities.

According to the evidence, a rational jury could find that the Mayor directly participated in the layoff process and its reversal and knew of the unfavorable outcomes that both would produce for Gronowski. Prior to the layoffs, Mayor Spencer expressed unhappiness with the way in which the Consumer Protection Office was being run and conveyed this sentiment to Commissioner Hart. The jury could reasonably infer from this that the Mayor shaped the form that the layoffs eventually took. Additionally, the Mayor, as the hiring authority for the City of Yonkers, is responsible for the placement of individuals in City positions. He assumed this role during the layoff process, met extensively with Hart and LaPerche, attended meetings concerning the reorganization of Consumer Protection, and ultimately approved the firing of each individual.

A reasonable juror could also find that Mayor Spencer knew of Gronowski's fate before he approved the layoffs. At an initial meeting, Hart proposed to the Mayor a plan to eliminate the Chief Clerk positions. It could be fairly inferred that the Mayor knew Gronowski's position was at issue since she was one of only four Chief Clerks in the City. Further, Commissioners Hart and LaPerche—instructed by the Mayor to engineer the layoffs—discussed Gronowski by name while formulating the reorganization plan.

Moreover, the Mayor was directly involved in reversing the layoffs. Shortly after the layoffs occurred, he issued a directive to restore union employees who

had been laid off and was responsible for the employees' placement. The Mayor's authority over these matters could lead the jury reasonably to infer that the Mayor decided not to place Gronowski in her original position. Additionally, Hart testified that he probably discussed the proposed reassignment of Gronowski to the Parks Department with either the Mayor or one of the Mayor's close advisors. This further supports the finding that the Mayor participated in the layoff process and its aftermath and knew of the consequences that would befall Gronowski.

### 3. The Mayor's Retaliation Against Gronowski

Viewed in the light most favorable to Gronowski, the totality of the evidence, although circumstantial, was also sufficient for the jury reasonably to find that the Mayor's decisions involving Gronowski were in retaliation for her political beliefs. A reasonable juror could find that the Mayor knew of Gronowski's political affiliation because she wrote to the Mayor to inform him of her campaigning activities for the local Democratic Party and because Gronowski's political persuasion was general knowledge in City Hall. Sufficient evidence also supports the finding that Spencer bore animosity toward Gronowski because of her political affiliation. Gronowski testified that the Mayor's attitude towards her changed after she became active in Borrelli's 1997 campaign. Our dissenting brother states that Gronowski's testimony that the Mayor was "aloof" is without value because she could not expect more from him, for example, a hug. Yet, Gronowski testified that prior to her involvement, Mayor Spencer greeted her with a "kiss on the cheek, a handshake, how are you." The fact that his behavior was markedly changed at this later time supports the finding that the Mayor demonstrated ill will towards her. After Borrelli's 1997 and 1999 campaigns, McGovern repeatedly warned Gronowski that she should cease her activities or suffer consequences. During Borrelli's 1999 primary campaign for mayor, McGovern told her that the Mayor was furious with her on account of her political activities.[1] Although at trial McGovern denied having made this comment, on review we cannot consider conflicting testimony and defendants have conceded, as they must, that McGovern made this statement. Further, in his deposition, Arena said that Gronowski told him that the Mayor warned her, through his emissary McGovern, that "she should lay off her political activities because it was going to come back and hurt her."

The jury could properly find from these warnings that the Mayor wished her to stop her political activities under threat of retaliation. It was also reasonable for the jury to determine that the Mayor had motivation to do so. Although Borrelli's 1999 campaign was only at the primary level, he

---

1. The dissent urges that these statements were double and triple hearsay. But defendants did not object to this testimony on this ground at trial or upon appeal, likely because the statements are party admissions under Fed.R.Evid. 801(d)(2)(D) and therefore fall outside the hearsay rule. This fact by itself may prohibit the evidence from being considered hearsay. *See Diaz v. United States*, 223 U.S. 442, 450, 32 S.Ct. 250, 56 L.Ed. 500 (1912) ("if hearsay evidence is admitted without objection, it is considered and given its natural probative effect as if it were in law admissible"); *see also United States v. Brown*, 348 F.2d 661, 663 (2d Cir.1965) (same). Even assuming that the declarations are hearsay, an appellate court cannot simply exclude them from the record to overturn a jury verdict when no objection was made below. Even in criminal trials, we will not consider a hearsay statement to be a ground for reversal unless it amounts to a "flagrant abuse." *See United States v. Rivera*, 22 F.3d 430, 437 (2d Cir.1994).

was essentially seeking the mayor's office, were he to win the primary. Borrelli lost in the primary and the Mayor was reelected several months before Gronowski was fired, but the jury could nonetheless reasonably find that Mayor Spencer thought Gronowski was disloyal and wished to punish her even though her support of Borrelli was no longer an immediate, direct threat to his political prospects. Additionally, in 1997 Borrelli had previously campaigned for a political position left vacant by the Mayor. It is not dispositive that the Mayor had no intention to again run for this position. Instead, it is reasonable to infer that the Mayor was angry at Gronowski because, for example, he had an interest in ensuring that the position was not filled by his ideological opponent.

A causal connection between Gronowski's firing and the Mayor's dislike of her political activities is further substantiated by the disparate treatment Gronowski received in the layoff and rehiring processes. Gronowski's experience stands in contrast to the other Chief Clerks who were laid off in that she was not kept on the City payroll, nor restored to her old department. The three other Chief Clerks did not lose a day of work and two were given positions in their original departments. Although two of these Clerks possessed civil service rights that Gronowski did not have, the jury could find that the difference in rights had little bearing on the treatment received by Gronowski. The City, after all, failed to reinstate Gronowski even after the layoffs were reversed. Indeed, most employees were reinstated in their pre-layoff jobs.

It is noteworthy that in addition to Gronowski, two other individuals who supported a rival of the Mayor were not offered their old positions. No one in the City administration attempted to restore Gronowski to her old job even though the general principle after the layoffs was to return people to their former positions. This failure is particularly surprising given that there were no legal impediments to rehiring Gronowski; the City had ample budgetary discretion in the reversal process and could have extended this discretion to reinstate Gronowski. The City hired additional part-timers to execute Gronowski's old duties, indicating that most, if not all, of the Chief Clerk's functions still had to be performed in the reorganized Consumer Protection Office. The fact that three of these replacements were friends of McGovern could instill further doubt in a juror's mind as to the propriety of the situation.

Very few permanent employees did not return to City employment after the layoffs. While Gronowski was given the opportunity to be rehired by the City—albeit several months after the layoffs—the jury could reasonably find that Gronowski was offered a job in the Parks Department in a way calculated to discourage her from taking it. The job was ill-suited to Gronowski's skills and experience and, as a result, her would-be supervisor expressed disappointment that Gronowski was offered the job. In fact, Gronowski was not informed of the position's salary until the day she was scheduled to report to work. We recognize that Gronowski had access to a document outlining the proposed plan for the consolidation of titles and clerk examinations, and that this document indicated that Chief Clerks were to be converted to the Clerk III position and given the same salary range. However, this document was drafted well before Gronowski had notification of the layoffs, and she was not automatically offered a Clerk III position. Moreover, this document only informed Gronowski of the salary *range* for the position rather than her precise salary, which she did not discover until the letter was received on September 25, 2000. She also

did not receive formal documentation of the grade until this date, nor was she given a description of her duties until some time after these letters were written. Finally, although Gronowski had a good basis for refusing the Parks job because she was not provided the "reasonable notice" of the position to which the civil service code entitles her, she was not reinstated to the preferred hiring list. This evidence indicates ill-treatment of Gronowski both during and after the layoffs and the jury could reasonably surmise that Gronowski was singled out for disparate treatment on the basis of her political views.

After a plaintiff has established the three *Mount Healthy* factors, the defendant still has the opportunity to show by a preponderance of the evidence that it would have taken the same adverse employment action "even in the absence of the protected conduct." *Mount Healthy,* 429 U.S. at 287, 97 S.Ct. 568. Defendants have not met this burden. At trial, the Mayor and the City argued that the budgetary crisis was the primary reason for the layoffs. There was evidence that the layoffs were not a rational response to the budgetary crisis, however, but rather were politically motivated. The City did not confer with the union even though they were contractually required to do so and Arena testified that some union members believed that the layoffs were "political 'hits.'" Although the dissent discredits Arena's statements on the grounds that they are self-serving or unreliable, in reviewing a jury verdict, an appellate court cannot determine the credibility of witnesses. *Norton v. Sam's Club,* 145 F.3d 114, 118 (2d Cir.1998).

Moreover, Commissioners Hart and La-Perche did not follow the recommendations of the study that they ostensibly relied upon and the execution of the layoffs was not consistent with the purported reasons. For instance, Hart testified that he told the Mayor the Chief Clerks were overpaid, but one Chief Clerk received the same salary after the layoffs and the other Chief Clerks only received a small, temporary reduction in pay. These findings, along with the other circumstantial evidence including McGovern's warnings and the plausible grounds for the Mayor's dislike of Gronowski, support a reasonable inference that the Mayor retaliated against Gronowski for her political activities.

In sum, the jury could have reasonably found from the evidence at trial that the Mayor was involved in the layoff and rehiring decisions that adversely affected Gronowski and could infer from the circumstances that his involvement was in retaliation for Gronowski's constitutionally protected political support for Borrelli. As such, individual liability was properly imposed upon the Mayor, and the judgment must be upheld in this respect.

### B. *Liability of the City of Yonkers*

Appellants also contend that liability was improperly imposed upon the City of Yonkers. Municipal liability may attach under § 1983 when a city policymaker takes action that violates an individual's constitutional rights. Even one episode of illegal retaliation may establish municipal liability under § 1983 if ordered by a person whose edicts or acts represent official city policy. *Pembaur v. City of Cincinnati,* 475 U.S. 469, 481, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986); *Jeffes v. Barnes,* 208 F.3d 49, 57 (2d Cir.2000). Where a city official "has final authority over significant matters involving the exercise of discretion," his choices represent government policy. *Rookard v. Health & Hosps. Corp.,* 710 F.2d 41, 45 (2d Cir. 1983).

Mayor Spencer's actions undoubtedly represent government policy. Be-

cause he has final authority over hiring and firing decisions, which are discretionary matters, his decisions in this area constitute the municipality's final actions. As stated above, the jury could have reasonably found that Mayor Spencer was personally involved in plaintiff's unlawful termination. Therefore, because he is the City's policymaker, the jury could also properly hold the City liable.

### III Appellants' Civil Service Defense

■ Finally, appellants make the novel argument that because New York Civil Service Law and 42 U.S.C. § 1983 were both enacted in part to prevent discrimination based on political affiliations, one cannot be in compliance with civil service law but at the same time be in violation of 42 U.S.C. § 1983. Plaintiff responds first by declaring that appellants waived this defense in failing to raise it in their Rule 50(a) motion at trial. We disagree with that proposition, and instead find that, after defendants raised this argument in their Rule 50(b) motion, Gronowski waived her right to object when she did not do so in her Rule 50(b) opposition papers. *Gibeau v. Nellis*, 18 F.3d 107, 109 (2d Cir. 1994) (holding that where the nonmoving party fails to object to a Rule 50(b) motion on the grounds of waiver, the objection itself is deemed waived).

■ Nevertheless, we conclude that appellants' civil service defense provides no basis to vacate the judgment. We do not agree that appellants could not have violated § 1983 if they complied with a state law that shares one of § 1983's purposes. The fact that City officials had discretion to lay off Gronowski and did not violate civil service law in failing to reinstate her in the Consumer Protection Office does not foreclose the possibility that retaliation for the exercise of her constitutional rights motivated these actions.

■ If there is sufficient evidence supporting a finding of illegal retaliation, we will not overturn a verdict arriving at such finding. Regardless of the City officials' conformity with civil service law, they must still refrain from violating rights protected under the United States Constitution. *See Sagendorf–Teal v. County of Rensselaer*, 100 F.3d 270, 276 (2d Cir.1996) (stating that "[a]lthough a probationary employee may usually be discharged with or without cause, she may not be discharged in violation of her First Amendment rights"). The Supremacy Clause of the Constitution guarantees that state law will not preempt or otherwise erode § 1983 causes of action and state law may not be used to immunize conduct violative of § 1983. To hold otherwise would "transmute a basic guarantee into an illusory promise." *Martinez v. California*, 444 U.S. 277, 284 n. 8, 100 S.Ct. 553, 62 L.Ed.2d 481 (1980) ("Conduct by persons acting under color of state law which is wrongful under 42 U.S.C. § 1983 ... cannot be immunized by state law.... [T]he supremacy clause of the Constitution insures that the proper construction [of § 1983] may be enforced.").

Appellants also insist that the City's adherence to state law, coupled with the lack of evidence in support of the retaliation claim, undermines the reasonableness of the jury's verdict. As already explained, we think sufficient evidence supports the jury's finding that the adverse employment actions affecting Gronowski were retaliatory. Indeed, this finding necessarily means that the City officials did not comply with New York state law, which under the New York Constitution requires "appointments and promotions" be made according to "merit and fitness." N.Y. Const. art. V, § 6 (McKinney's 2001). We therefore reject appellants' argument.

CONCLUSION

Accordingly, we hold the evidence produced at trial was sufficient to impose liability upon Mayor Spencer and the City of Yonkers for retaliating against Gronowski due to her exercise of First Amendment rights. The judgment entered in the district court in plaintiff's favor, as well as its award of attorneys' fees and costs, is affirmed.

OWEN, District Judge, dissenting.

I respectfully dissent. I am of the view that as a matter of law the evidence—even with the jury considering the multiple hearsay I believe inappropriately received over initial objections, see infra, was insufficient to support the jury's verdict that Mayor Spencer—and through him the City of Yonkers—did anything that was in retaliation against plaintiff Joan Gronowski, one of Spencer's "chief clerks", for politically affiliating herself with and giving active support to a competitive mayoral candidate to Mayor Spencer.

This unfortunate matter began in the spring of 2000 when Yonkers found itself facing a substantial budget crisis [JA–144].[1] At about the same time, a city document was prepared entitled "JOB ANALYSIS/TEST DEVELOPMENT REPORT FOR SELECTED YONKERS CLERICAL TITLES." [JA–523] The document's introduction addressed a problem of overstaffing, reading:

The City of Yonkers currently employs a number of provisionals that is significantly higher than the average percentage of provisionals within New York State municipalities. The New York State Civil Service Commission has *directed* the City of Yonkers to immediately reduce its provisional count. (emphasis supplied).

Following this, Ernest F. Hart, the Mayor's Commissioner of Personnel (who happened to be a lawyer) was directed to confer with Finance Commissioner James LaPerche to deal with the elimination and consolidation of titles, eventually involving some 35 employees [JA–173] and Hart recommended among many others the elimination of the four "chief clerks" he felt were overpaid office managers. Thereafter—"after the study" as Hart put it, he reported his list to the mayor. [JA–168–72]. Hart never talked about any "particular people" [JA–167].[2] He was solely structuring the cutting by "identifying the position" to be terminated.[3] Having done

---

1. These references are to the trial record in the joint appendix.

2. [JA–171–2]

    Q  Now, you recommended, you said in prior accounts, the elimination of the position of chief clerk because you thought the incumbents were like office managers, right?

    A  Yes.

    Q  And you thought the incumbents were overpaid, right?

    A  I did.

    Q  Did you know what Joan Gronowski was doing on a day-to-day basis when you made that conclusion?

    A  No clue.

    Q  Did you ever talk with her about what she was doing?

    A  No. That's why we did a study.

    Q  And when you made this proposal to eliminate the chief clerk position, you did it at a meeting with Mr. LaPerche and Mayor Spencer; is that right?

    A  Well, I don't remember when I made the proposal, the thing is, *after the study, of course at some point I would have to tell the mayor,* but pursuant to the study, I recommended the elimination and consolidation of titles like chief clerk, manager of administration. (emphasis supplied).

3. [JA–168]

    Q  So when had you (sic) identified the position you spoke with him about Ms. Gronowski, this is Mr. LaPerche?

    A  Along with everybody else, yes.

this analysis, Hart recommended that 30 positions be terminated to comply with the study.[4]

Thus, on this record, Hart initiated and forwarded the inclusion of the "chief clerks" among those as appropriate for termination. Gronowski happened to be one of those. Mayor Spencer therefore had nothing to do with her termination except to sign off.

The first major problem with this case—which everybody concedes—is that there is no direct evidence that the mayor *did anything*.[5] The second major problem is some multiple hearsay where Gronowski testified that Frank McGovern, one of the Mayor's aides, told her that the Mayor had told him he was "furious"[6] because of her active support of a competitor for his office. I note that the first two times such inadmissible hearsay was offered defense counsel objected and was overruled by the Court, (JA–54–5 and 78) after which counsel gave up objecting to this type of questioning. The record is replete thereafter with such double, indeed a triple hearsay—and while I feel it should have been excluded even accepting it there is still no showing the Mayor acted.

The majority acknowledges that at no time did Gronowski have a confrontation with the Mayor although they find it of evidentiary weight that beginning in 1997, Gronowski testified the Mayor acted more "aloof" towards her then he had previously [JA–57]. While this, in my view, is the only evidence competently attributed to the Mayor as to his feelings—not actions—and was, according to Gronowski after Borelli became a potential Democratic candidate for mayor against Mayor Spencer and Gronowski had chaired fund-raisers for Borelli and campaigned with him on weekends that she said Mayor Spencer became "a little more aloof" with her—but what could she have expected at that point, a hug?

Turning to the testimony of union official Angelo Arena called by Gronowski, it

---

> Q And what did you say about Ms. Gronowski?
> A I don't remember saying anything about her particularly.
> Q Now, you came up with the idea of abolishing the clerk's position, didn't you?
> A Yes.

4. I attach no evidentiary weight, as does the majority, to the fact that staffers Hart and LaPerche, after picking positions and titles to terminate, mentioned among themselves the names of those in those positions, (*see* fn. 3, *supra*, which necessarily included Gronowski). But that is not evidence that the mayor did anything in selecting her—or any of the others—for discharge.

5. The District Judge later in the trial similarly observed in a colloquy with counsel. (A 456).
  THE COURT: I've never not (sic) had a concession from the defense the mayor acted under color of are state law, if acted at all. The problem here the mayor did nothing whatsoever. I think that's the problem, right, isn't that the problem?

MR. PLUNKETT: Yes, your honor. One of them.

6. I note here that McGovern disputed Gronowski's testimony, he testifying that the remark "furious" was never said to him by the Mayor. [JA–445] Indeed, when Arena was called as a witness he confirmed this [JA–382]. But as observed above, even disregarding these denials, there is no evidence that the Mayor ever *did anything* on account of any "fury".

  Even accepting this double hearsay characterization given by McGovern who regarded himself as a "Dutch uncle" to Gronowski (JA–410), it was in the nature of advice from a friend. " . . . [w]hy are you getting involved with this stuff, it's just not a smart thing to do. You don't—I divorced myself pretty much from politics when I came on board, you know, I sort of stayed away from it and you should. I mean, I just, common sense you stay away from that kind of stuff, you don't pick sides or choose sides or anything like that."

is filled with material contradictions and limitations that negate the Mayor's liability. For example, he testified at trial as follows [JA–397]:

Q Am I correct that, other than Joan Gronowski, nobody has told you that her position being abolished had any political motivation?

A You're correct in that assumption, sir.

Q So the only person to tell you was Ms. Gronowski; is that correct?

A Yes, sir.

But earlier [JA–382] Arena had negated any Mayoral input:

Q Had Joan Gronowski, before the layoffs, ever come to you and talk to you about Frank McGovern; yes or no?

A Yes.

\*       \*       \*       \*       \*       \*

Q And what did she tell you, in essence?

A Basically that she was approached by Frank McGovern and told that she should lay off her political activities because it was going to come back and hurt her.

Q And did she indicate to you one way or the other whether Mr. McGovern told her he was *speaking for the mayor?*

A. *No.*[7]

(emphasis supplied)

Arena's waffling is further demonstrated by the following four quotes, the first at JA–468:

Q. [This from Arena's deposition testimony] "As I was being told by some of the members in some phone calls and by Gronowski herself, that the mayor was targeting certain people for political reasons." Are those the rumors you're referring to, sir?

A. Yes, sir.

This should be compared to the quote from JA–395 above limiting this to Gronowski only.

Then at JA–466, while Arena wrote his International Union President:

Q. Well, the statement said, "it is our opinion that most of these layoffs are political 'hits,' " correct?

A. Yes.

He testified he had no competent basis for this [JA–467]:

Q. Were you basing that on rumors?

A. Yes, sir.

Q. And that rumor was from Ms. Gronowski?

A. Yes, sir.

Q. Anybody else?

A. Some members, but only rumors or conjecture, sir.

After giving these answers he then made the startling admission that all these statements were only based on personal opinion or rumor or conjecture and that he would write "anything" to help his union.

Q. "In the second paragraph you wrote, "It is our opinion that most of these layoffs are political," quote, unquote, 'hits.' What are you referring to"?

7. [Footnote by the Court] As to the double or triple hearsay answers given by Gronowski and Arena, I would note that such are universally recognized as of highly questionable reliability, particularly where it is transmitted through two or three transmitters' successive recollections and as here uttered by witnesses Gronowski and Arena as highly *self-serving* declarations. This is particularly so here where I earlier noted McGovern under oath denied that he had said this, and Arena on the trial testified similarly above that Gronowski never told him that McGovern told her he was speaking for the Mayor. [JA–382]

"Answer: I was referring to the 30–some–odd people that I lost at the time. And again, having the reputation this union has had for years and years, I was willing to write anything to the international to make him aware of my personal opinion on these things, plus what I was being told, rumors, whatever you want to call it. I was going to do whatever I can to help this union."

Do you remember writing those words, saying those words under oath at your deposition?

A. Yes, sir. (emphasis supplied)

This, admission about stretching facts, "—write anything—" to help his union, undercuts Arena's testimony and Gronowski's case so badly—particularly viewed against his several wafflings as to crucial material matters, *supra,*—in my view renders his testimony inherently unreliable as any basis for a conclusion against the Mayor.

Further, the majority infers that "... the Mayor was *actively involved* in reversing the layoffs and took responsibility for where employees were placed." (emphasis supplied). However, the page of Victor Pacheco's testimony it cites for this inference supports nothing more than that the mayor had the authority in that area. It does not support an inference that he was "actively involved" in a retaliatory exercise of it against Gronowski, or any of the other 30 affected by the budget crisis.

That Pacheco testimony reads [JA–362–3]:

Q. Well, to your knowledge then, the mayor was directly involved in ensuring Mr. Breheny stayed in Parks—when his title—hold on—

when his new civil service title was in another department; was that your testimony?

A. Was he directly involved?

Q. I'm asking you, you raised the mayor.

A. I'm just saying, everything falls under the mayor's hiring authority.

THE COURT: His question is: Do you know, to your knowledge, of your own knowledge do you know that the mayor was involved in the fact that this gentleman stayed in Parks, if, in fact, he stayed in Parks, because you say you don't know whether he stayed in Parks.

THE WITNESS: No, I do not.

The majority opinion relies in part on the assertion that the first letter Gronowski received outlining her new grade and salary came on the "day she was instructed to report to work, September 25, 2000." While the majority does not claim the Mayor had anything to do with this single and "late" communication, factually any inference of retaliation is undermined by several materially different particulars. First the job for her did not come into existence until September 20, five days before she was to report. It was authorized for her alone. [JA–665]. She was called about it that very day, September 20, by Pacheco. [JA–113–4]. The next day Hart sent her a letter about it dated September 21 which she acknowledges she got on September 22, [JA–91] three days before she was to report. In addition to the foregoing, Gronowski had been informed the prior June in writing (three months earlier) that her new grade, clerk III, was for her [JA–646] going to be at the same salary as the old grade of chief clerk.[8]

---

8. Plaintiff's Exh. 20, a letter to Gronowski from the Civil Service Commission, dated June 30, 2000, confirms this and that her name was on a preferred list. [JA–627]. It reads in part:

On July 1, 2000 your position of Chief Clerk was abolished. Your name will be placed

Her trial testimony acknowledging all this at JA–112–3 reads:

Q. There's an entry that says "chief clerk," correct?

A. Correct.

Q. And if you go across that line, there's a salary range; 40,784 to 49,028, correct?

A. Correct.

Q. And it says, "nine and ten," correct?

A. Yes.

Q. But then its says "Clerk III." You see that?

A. Correct.

Q. And it has the exact— it has the salary range for that position, correct, 37,000 to 49,028, correct?

A. Correct.

Q. So you were aware in June of 2000, that the old grade would have been Chief Clerk and the new grade was Clerk III, correct?

A. Correct.

Q. So you were aware from this document, in June, long before September, what the salary range was for the Clerk III, correct?

A. Correct.

Q. And that, as a chief clerk, the new position was Clerk III, correct?

A. Correct.

Q. So when Mr. Pacheco called you on September 20 and said you're going to get a Clerk III position, you were aware in June— from June what the parameters of that position were, correct.

A. Correct.

All of this satisfies the reasonable notice she was entitled to receive for the avail-

ability of the new job at the same level of pay and the same level of job.

As to why she did not take the job, her testimony reads [JA–93]:

Q. At this point, Ms. Gronowski, what were the reasons for not going to the Parks Department?

A. I didn't know what the job was, primarily.

And she testified that the next day [JA–94] she requested the title and salary of her restored position, and this notwithstanding she had known since June that Clerk III (see JA–643, 646 and JA–112–113 above) paid the same salary she had received when she was let off.

Finally, I observe that the majority, stating that "the City *hired* other employees to handle Gronowski's old duties in consumer protection [,]" (emphasis supplied) suggests that the Mayor had an awareness of the efforts taken to get her out, and therefore his participation. However this is contrary to the record. Michael Paulericio testified at [JA–284]:

Q. Now after Ms. Gronowski left in July 2000, did you come to know a woman named Tashara Moses?

A. Yes, I did.

Q. How did you come to know her?

A. She was put in there, she was an intern.

Q. She was put in there after Ms. Gronowski left?

A. I think she was working in there also with Joanie before that.

Q. And directly after Ms. Gronowski left, was she doing any of Ms. Gronowski's work?

A. All of it.

While others from within the department later took over those duties, it was

on a Preferred List for this position for a period of four (4) years from July 1, 2000,

to be certified in the future for reinstatement to this position.

not until Ms. Moses proved to be inadequate. This, whatever else, the Mayor had no part in.

Turning to the applicable law, I agree with the majority that to overturn a verdict, there must be " 'such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or such an overwhelming amount of evidence in favor of the [appellant] that reasonable and fair minded men could not arrive at a verdict against [the appellant].' " *LeBlanc–Sternberg v. Fletcher*, 67 F.3d 412, 429 (2d Cir.1995) (quoting *Song v. Ives Laboratories, Inc.*, 957 F.2d 1041, 1046 (2d Cir.1992)). I submit that exists here, only "rumor" or "conjecture". (*See* Arena testimony quoted above).

But I go on and further agree with the majority that for there to be an award of damages, a plaintiff must show by a preponderance of the evidence that the defendant was personally involved—that is, he directly participated—in the alleged constitutional deprivations. " '[D]irect participation' as a basis of liability in this context requires intentional participation in the conduct constituting a violation of the victim's rights by one who knew of the facts rendering it illegal." *Provost v. City of Newburgh*, 262 F.3d 146, 155 (2d Cir.2001). I do not reject—implicitly or explicitly—as the majority suggests, any law in *Provost* at 155 or *Morris*, 196 F.3d at 110 having to do with an employer's state of mind or how it can be proved. But I do not on this record find as a factual matter any support for a conclusion of personal involvement or direct participation by the Mayor at any stage of Gronowski's alleged constitutional deprivation here.

Whatever degree of displeasure the Mayor, being human, understandably felt knowing that one of his senior staffers openly supported a challenger for his very office, or to whatever degree the jury could have found the Mayor was displeased because of this, I do not find any evidence to support this damaging opprobrium visited on this substantial public servant when he did nothing whatever to *act* against Gronowski because of these feelings.[9]

Accordingly, I would reverse, and grant the Mayor and the City of Yonkers' successive Rule 50 F.R.C.P. motions before and after verdict for judgment in their favor as a matter of law.

---

9. Having played no role in Gronowski's inclusion in Hart's list of layoffs, the Mayor can neither be faulted for having failed to remove her name from the list after it was presented to him. Indeed, such an action would have amounted to the very same discrimination improperly deemed to have occurred here.