22-41(L)
*Krause v. Kelahan et al.*

# In the
# United States Court of Appeals
## For the Second Circuit

August Term, 2023

(Argued: May 10, 2023      Decided: December 3, 2025)

Docket Nos. 22-41 (L), 22-288 (Con)

LISA KRAUSE,

*Plaintiff-Appellee,*

—v.—

GREG KELAHAN, SUPERINTENDENT, ORISKANY CENTRAL SCHOOL DISTRICT, ORISKANY CENTRAL SCHOOL DISTRICT, ORISKANY CENTRAL SCHOOL DISTRICT BOARD OF EDUCATION,

*Defendants-Appellants,*

CARL GRAZADEI, BOARD PRESIDENT, MICHELLE ANDERSON, MEMBER, ROBYN APPLER, MEMBER, THERESE HANNA, MEMBER, ADAM KERNAN, MEMBER, AMY MAYO, MEMBER, TAD BEAVER, FORMER MEMBER, CHARLES COURTNEY, FORMER MEMBER, DONALD ROTHDEINER, FORMER MEMBER, SHIRLEY BURTCH, VICE PRESIDENT, PATRICK HOEHN, FORMER MEMBER, MIKE DAVIS, REPRESENTATIVE OF "ORISKANY ADMINISTRATOR'S UNION",

*Defendants.* [*]

---

[*]The Clerk is directed to amend the caption as shown above.

B e f o r e :

CARNEY, SULLIVAN, and LEE, *Circuit Judges*.

——————————

Defendants-Appellants the Oriskany Central School District, its Board of Education, and its former Superintendent Greg Kelahan (collectively, "Defendants") appeal from a judgment entered in favor of former high school principal Plaintiff-Appellee Lisa Krause following a six-day jury trial in the U.S. District Court for the Northern District of New York (Hurd, *J.*). The jury concluded that Defendants fired Krause and subjected her to a hostile work environment because of her gender, all in violation of Title VII and the New York State Human Rights Law. It awarded Krause $484,456 in damages.

On appeal, Defendants contend that the jury's verdict on Krause's discriminatory discharge claim was not supported by substantial evidence. They also seek a reduction of the damages award on the ground that Krause should have been precluded from recovering lost-income damages. And they urge that certain asserted trial errors such as the judge's evidentiary rulings and his comments about the evidence were so severe as to require a new trial.

We find merit in none of these arguments. For the reasons set forth below, after careful review of the trial record, we conclude that Defendants have not shown that insufficient evidence supported the verdict, that the award of lost-income damages was improper, or that the trial was unfair.

Defendants' primary challenge arises from a confusing comment made by the District Court to the jury during trial, concerning whether New York law allowed Krause as high school principal to amend a student's peanut allergy accommodation plan without consulting a particular school committee. But Defendants have not shown they were prejudiced by the comment and indeed, because it was Defendants' own contradictory positions that seem to have caused the District Court's confusion, even if there were some marginal prejudice, we would not conclude that justice requires a new trial. *See* Fed. R. Civ. P. 61. We therefore affirm the judgment of the District Court.

Judge SULLIVAN dissents in a separate opinion.

AFFIRMED.

——————————

2

A.J. BOSMAN, Bosman Law Firm LLC, Blossvale, New York (Stephen Bergstein, Bergstein & Ullrich, New Paltz, New York, *on the brief*), *for Plaintiff-Appellee Lisa Krause.*

CHARLES C. SPAGNOLI, Ferrara Fiorenza PC, East Syracuse, New York, *for Defendants-Appellants Greg Kelahan, Superintendent, Oriskany Central School District; Oriskany Central School District; Oriskany Central School District Board of Education*.

———————

CARNEY, *Circuit Judge*:

Defendants-Appellants the Oriskany Central School District, its Board of Education, and its former Superintendent Greg Kelahan (collectively, "Defendants") appeal from a judgment entered in favor of former high school principal Plaintiff-Appellee Lisa Krause following a six-day jury trial in the U.S. District Court for the Northern District of New York (Hurd, *J.*). The jury concluded that Defendants fired Krause and subjected her to a hostile work environment because of her gender, all in violation of Title VII of the Civil Rights Act of 1964 (Title VII), 42 U.S.C. § 2000e *et seq.*, and the New York State Human Rights Law (NYSHRL), N.Y. Exec. Law art. 15. It awarded Krause $484,456 in damages.

On appeal, Defendants contend that the jury's verdict on Krause's discriminatory discharge claim was not supported by substantial evidence. (They do not similarly challenge the hostile work environment verdict in her favor.) They also seek a reduction of the damages award, which included (wrongly, they say) lost-income damages. And they urge that certain asserted trial errors were so severe as to require a new trial.

We find merit in none of these arguments. For the reasons set forth below, after careful review of the trial record, we conclude that Defendants have not shown that

3

insufficient evidence supported the verdict, that the award of lost-income damages was improper, or that the trial was unfair.

Defendants' primary challenge arises from a comment made by the District Court to the jury during trial, concerning whether New York law allowed Krause as the school's principal to amend a student's peanut allergy accommodation plan with the parents' consent but without consulting a particular school committee. But Defendants have not shown they were prejudiced by the comment, confusing though it was. And indeed, because it was in part Defendants' own contradictory positions that appear to have led to the District Court's error, we cannot conclude that justice requires a new trial. *See* Fed. R. Civ. P. 61. We therefore affirm the judgment of the District Court.

**PROCEDURAL BACKGROUND**

The Oriskany Central School District (the "School District") includes two schools: an elementary school for students in kindergarten through sixth grade, and a junior-senior high school (the "High School" or "the School") for students in seventh through twelfth grade. In December 2014, Krause began work as principal of the High School. During her tenure, Krause reported to School District Superintendent Greg Kelahan. It was his behavior, she alleges, that created a hostile work environment and that, with the actions of the Board of Education (the "Board") and others, led to her being placed on administrative leave in September 2016 and then terminated in October 2016, as we describe in greater detail below.

In February 2017, Krause filed a complaint with both the New York Department of Human Rights and U.S. Equal Employment Opportunity Commission (EEOC), the latter of which soon issued her a Right-to-Sue letter. Proceeding to state court in August 2017, Krause sued Defendants-Appellants here: the School District, Board, and

4

Kelahan.[1] Defendants timely removed the action to the U.S. District Court for the Northern District of New York. In Krause's Amended Complaint, she alleged, *inter alia*, that Defendants violated Title VII, the NYSHRL, and the Equal Protection Clause of the U.S. Constitution by subjecting her to a hostile work environment and discharging her because of her gender.

The case proceeded to summary judgment, and in May 2020, the District Court (Kahn, *J.*) ruled for Defendants on Krause's equal protection claim but sent the case to trial on certain of her Title VII and NYSHRL gender discrimination and hostile work environment claims. *See Krause v. Kelahan*, No. 6:17-cv-01045, 2020 WL 2838859, at *26 (N.D.N.Y. May 29, 2020). The court determined that there was no genuine dispute of material fact as to whether gender discrimination was a but-for cause of her termination—a prerequisite for her equal protection claim—but that Krause had adduced sufficient evidence that her gender was a "motivating factor" in her termination—the less onerous prerequisite for her Title VII and NYSHRL discriminatory discharge claims.[2] *See id.* at *20–21. It permitted the Title VII and NYSHRL claims to survive summary judgment and continue to trial.

---

[1] Krause also sued Board President Carl Grazadei; Board Vice President Shirley Burtch; Board Members Michelle Anderson, Robyn Appler, Therese Hanna, Adam Kernan, Amy Mayo, and Tad Beaver; Former Board Members Charles Courtney, Donald Rothdeiner, and Patrick Hoehn; and Mike Davis, Representative of "Oriskany Administrator's Union." The District Court granted Defendants' motion to dismiss her claims against Davis and Burtch, and it granted summary judgment for Defendants as to her claims against Hoehn. Shortly before trial, the court declined to exercise supplemental jurisdiction over Krause's pending NYSHRL claims against the individual Board members. As a result, Krause proceeded to trial and secured judgment on her claims against only Kelahan, the Board, and the School District.

[2] As discussed in more detail below, Defendants now assert that the court's equal protection ruling barred Krause from recovering lost-income damages on her surviving claims.

Over six trial days in October 2021, sixteen witnesses (seven for Krause, nine for Defendants) testified about the events that led to Krause's termination; Defendants also played for the jury a video recording of portions of one witness' deposition.[3] The parties offered evidence in support of their conflicting narratives about Krause's performance and tenure as principal. According to Krause, she was a promising new principal whose success was prevented by her sexist boss, Kelahan, and a School Board that was unwilling to rein him in. Defendants urged, on the other hand, that they fired Krause because she was incompetent and made serious errors of judgment.

The jury returned a special verdict for Krause on all her pending claims. It found, *inter alia*, that (1) gender was a motivating factor in Defendants' decision to terminate Krause; and (2) Defendants subjected Krause to a hostile work environment. It also concluded that Defendants had not shown by a preponderance of the evidence that they would have terminated Krause even absent a discriminatory motive—a defense that would have prevented Krause from collecting lost-income damages. The jury awarded Krause $484,456 in damages, including $334,456 for lost income and $150,000 for pain and suffering.

After trial, Defendants renewed their trial motion for judgment as a matter of law and also moved for a new trial and for a reduction of damages. The District Court denied these motions, *see Krause v. Kelahan*, 575 F. Supp. 3d 302, 315 (N.D.N.Y. 2021), and further awarded Krause $130,186.31 in attorney's fees and expenses, *see Krause v. Kelahan*, No. 6:17-cv-01045, 2022 WL 306365, at *4 (N.D.N.Y. Feb. 2, 2022).

Defendants timely appealed.

---

[3] Incidentally, a few weeks before the trial's scheduled start, the case was reassigned to Judge David N. Hurd, who presided over the trial.

**DISCUSSION**

Defendants now challenge the District Court's judgment for Krause on several grounds. First, they argue that sufficient evidence did not support the jury's verdict for Krause on her discriminatory discharge claim, and so the District Court erred by denying them judgment as a matter of law on the claim. Second, they contend that the court erred by allowing Krause to recover damages for lost income. Third, they contend that a lengthy menu of purported District Court errors entitled them to a new trial. They urge in particular that a comment by the court seriously misled the jury about New York laws governing accommodations for students with disabilities, undercutting their defense that Krause's performance was unacceptable.

We examine Defendants' challenges to the trial below,[4] and for the reasons set forth, we affirm the District Court's judgment.

---

[4] In addition to trial error, Defendants assert that the District Court erred by awarding Krause attorney's fees for work done on her behalf between September 2016 (when she was placed on administrative leave) and January 2017 (when Krause's counsel first mentioned the EEOC complaint in time entries). The fees for this period purportedly cover more than $10,000 of the $130,186.31 that Krause received in fees. On review, we have no doubt that the District Court acted well within its "broad discretion in granting a fee award and assessing a reasonable fee under the circumstances of the case." *Luciano v. Olsten Corp.*, 109 F.3d 111, 115 (2d Cir. 1997). In a Title VII case, the prevailing plaintiff may recover fees for "the number of hours reasonably expended by counsel on the litigation," *id.*, including time spent preparing to file her complaint. She can also recover fees she incurs in preparing for related EEOC or state administrative proceedings before filing her Title VII action. *See N.Y. Gaslight Club, Inc. v. Carey*, 447 U.S. 54, 61–63 (1980) (explaining that Title VII's attorney's fees provision, 42 U.S.C. § 2000e–5(k), authorizes fees for prevailing parties in "any . . . proceeding under [Title VII]," which includes EEOC proceedings and related state and local administrative proceedings). Based on the time entries submitted by Krause's counsel, the District Court reasonably awarded fees for the period between September 2016 and January 2017. During the relevant period, Krause's counsel reached out to potential witnesses, communicated with Defendants on Krause's behalf, and prepared Krause's administrative filing under N.Y. General Municipal Law § 50-h. We see no basis for Defendants' argument and so reject its challenge to the fee award.

7

**I.**    **The District Court did not err by denying Defendants' motion for judgment as a matter of law on Krause's discriminatory discharge claim.**

Defendants assert that the trial evidence was insufficient to support the jury's verdict for Krause on her discriminatory discharge claim. Our review is de novo. *See Kinneary v. City of New York*, 601 F.3d 151, 155 (2d Cir. 2010).

A party seeking to disturb a jury's verdict on sufficiency grounds "bear[s] a heavy burden." *Gronowski v. Spencer*, 424 F.3d 285, 292 (2d Cir. 2005). The record must reflect "such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or the evidence in favor of the movant[s] [must be] so overwhelming that reasonable and fair[-]minded persons could not arrive at a verdict against [them]." *Kinneary*, 601 F.3d at 155.[5]

Defendants have not carried that heavy burden. During trial, Krause had to adduce sufficient evidence for a jury to find by a preponderance that she was discharged because of her sex: that is, that sex was at least "a motivating factor" in Defendants' decision to terminate her, even if "other factors also motivated" her termination. 42 U.S.C. § 2000e-2(m). In light of the evidence presented at trial, the jury could reasonably conclude as it did: that Krause's sex was a motivating factor here.

Below, we canvas some of the trial evidence supporting the jury's verdict. When evaluating Defendants' sufficiency challenge, we must "examine the evidence in the light most favorable to the party in whose favor the jury decided" and "draw[] all reasonable inferences in the winning party's favor." *Gronowski*, 424 F.3d at 291. It is not our role to "weigh conflicting evidence, determine the credibility of witnesses, or substitute our judgment for that of the jury." *Id.* at 292. Therefore, we focus here on the

---

[5] Unless otherwise indicated, we omit from quoted language all internal quotation marks and internal citations, and we adopt all alterations.

evidence that Krause presented—and that the jury reasonably could have believed—about her termination.

A.    Kelahan's comments about women and his treatment of female employees

Krause gave in her own testimony a detailed account of Kelahan's disrespectful and demeaning behavior towards the women with whom he worked.

Soon after she started the job in December 2014, she said, she witnessed Kelahan scream at a female Board of Cooperative Educational Services employee during a phone call. The "level of viciousness and the level of hostility" made an impression on Krause, particularly because Kelahan was looking at Krause while on the call "as if to say, take note." Joint App'x 1119/56. Krause found Kelahan "[v]ery quick to anger and very snide in his comments." *Id.* at 1121/61.

Within three or four months, Kelahan began directing his ire at Krause, including by threatening to fire her at the end of the school year. Just before Krause went onstage for the school's graduation ceremony, Kelahan told her, "If you f*** this up, I will fire you, but good luck and have fun." *Id.* at 1123/71. In another instance, Kelahan texted Krause a just-captured photograph of her with the message, "See, you are always being watched." *Id.* at 1121/61; *see also id.* at 1316/839 (Kelahan admitting that he sent this text and describing it as "silliness").

Kelahan's criticism was often unrelated to Krause's job performance. For instance, Kelahan disparaged Krause's office decorations as "very girly." *Id.* at 1120/59. He made frequent "[s]arcastic" and "condescending" comments about her parenting skills—asking Krause on between five and ten occasions, "What kind of mother are you?" *Id.* at 1122/66–67. He also became angry when Krause informed him that she needed to leave the High School one day to care for her injured daughter. When his

harsh reaction brought Krause to tears, Kelahan scoffed: "That's why I hate working with women so much. They are always so emotional." *Id.* at 1122/68.

Kelahan frequently commented on his female employees' clothing choices. When Krause wore a dress to work, Kelahan told her that he "love[d] it when women wear dresses." *Id.* at 1123/69. He also faulted other women for their clothing choices, including a teacher who wore skirts that Kelahan viewed as too short, and a guidance counselor who wore what Krause described as "men's suits." *Id.*

Kelahan's relationship with his male employees was much friendlier than his relationship with Krause. He was "buddies" with the male elementary school principal and "treated him with dignity." *Id.* at 1126/82–83. In contrast to what Krause saw of and heard about Kelahan's treatment of women, she did not hear any stories about Kelahan "disrespecting, demeaning or screaming at men," or making comments about male employees' clothing. *Id.* at 1140/138.

Krause's account of specific incidents was partially corroborated by several other witnesses, who either witnessed Kelahan's behavior themselves or heard about it contemporaneously from Krause. Margaret Beck, a retired principal, served as a Board of Cooperative Educational Services (BOCES) mentor for Krause in her new role as principal. Beginning in Spring 2015, Beck met with Krause at least once every other week. Beck recalled Krause complaining about comments made by Kelahan, including his remark that "[t]his is why I hate working with women. They are so emotional." *Id.* at 1229/491–92. Krause also told Beck that Kelahan was dissatisfied with the guidance counselor's clothing choices. Beck added her own account of a similar interaction with Kelahan: when Kelahan hired Beck as a BOCES mentor, he asked her to "try to get [Krause] to dress better," *id.* at 1227/485—but upon meeting Krause, Beck thought Krause's outfits were appropriate.

Several witnesses saw Kelahan scream at Krause. For example, Colleen Zumbrun, the secretary in the Guidance Office during Krause's tenure, "observed [Kelahan] slamming the door in [Krause's] office and . . . hear[d] him yell at her." *Id.* at 1171/264. Zumbrun believed that Kelahan treated Krause differently than male faculty and staff. Two guidance counselors remembered Krause telling them that Kelahan had "screamed" or "yelled" at her. *Id.* at 1289/732, 1294/752. Robyn Appler, who substituted in the school as a secretary and a monitor and was later appointed to the Board, heard Kelahan raise his voice when speaking to Krause; she also recalled Krause being "upset" and saying Kelahan was "mean, nasty, and belittling." *Id.* at 1182/305–06. Appler described Kelahan as "more in attack mode" with Krause than with other employees. *Id.* at 1181/303.

In March 2016, Appler complained to the Board about Kelahan's behavior towards Krause and others. *See id.* at 1452 (Board meeting minutes noting that Appler and her husband "discussed concerns with the Superintendent"). Appler described Kelahan's "bullying behavior," and warned the Board: "We finally have a good principal and you are trying to push her out the door." *Id.* at 1166/243. In the days after that Board meeting, Krause testified that Kelahan's treatment of her became "[ten] times worse." *Id.* at 1166/242. He refused to look at Krause and would walk away if she attempted to speak to him for more than "30 seconds." *Id.* at 1126/84. Krause complained to at least three Board members about Kelahan's conduct, all of whom reassured her that the Board was aware of the issue and was working to fix it.

Based on this evidence, the jury could reasonably have concluded that Kelahan treated Krause badly because of her gender.

B. Krause's performance as High School principal

A reasonable jury could also have found that, under the circumstances, Krause performed adequately well as High School principal. Two witnesses testified that Krause had the skills and motivation to be a good principal. Zumbrun described Krause as "an asset" to the School District, a principal who was "engaged with the students" and "easy to work with." *Id.* at 1171/262–63. Beck—who had mentored many principals—told the jury that Krause was "doing a fine job," and that she believed that Krause had the capacity to succeed in the role. *Id.* at 1229/492.

To the extent that the High School experienced some managerial issues during Krause's tenure, the jury could reasonably have attributed those issues to Kelahan. Beck testified that Krause's "problem" was that "she never knew how she was going to find Mr. Kelahan. One minute complimenting her, the next minute being angry." *Id.* at 1229/493. Beck also observed that Krause "didn't seem to have any autonomy in her office" and "really couldn't take a step either way without getting permission from Mr. Kelahan." *Id.* Krause told the jury that she thought Kelahan designed tasks for her to be "as convoluted as possible so that she w[ould] fail." *Id.* at 1124/76. She also felt that he undermined her relationships with the employees whom she supervised, including by falsely telling two employees that Krause wanted to fire them. Exacerbating the problem, Krause said, Kelahan—although working in a different building—appeared in the High School several times each day and sometimes stayed for the entire day. This made it "very difficult [for Krause] to create [her] authority in that building." *Id.* at 1132/107.

Several of Defendants' witnesses painted Krause as an incompetent principal. But the jury might reasonably have disbelieved or discounted their testimony, or formed the view—consistent with Krause's and Beck's account—that Kelahan was responsible for many of the problems that the witnesses observed. For instance, one of

12

Krause's supposed faults was that she was "often seen crying." *Id.* at 1254/591; *see also id.* 1291/740–1292/741, 1294/751 (guidance counselor testifying that Krause "killed the morale in the building" because her demeanor was "[u]sually kind of sad, down," and she would "go to various spots in the school to hide, crying at such times"); *id.* at 1278/685 (Krause's assistant testifying that she was "upset and emotional" in response to criticism); *id.* at 1181/303 (Appler testifying that she observed Krause "visibly upset" and "shaking" after interactions with Kelahan). Nothing Defendants presented precluded a reasonable jury from determining that Krause's distress was an understandable reaction to Kelahan's abuse and not a measure of her competence at her assigned job.

C.     Kelahan's justifications for terminating Krause

Finally, the jury could also have concluded that the School District's stated reasons for terminating Krause's employment were pretextual. In September 2016, Kelahan formally recommended to the Board that it terminate Krause's employment, and he placed her on administrative leave pending a Board vote. In a letter to Krause dated that month, Kelahan gave her three reasons for his recommendation: (1) her low scores on performance evaluations conducted by Kelahan; (2) her failure to improve "[d]espite being on a Principal Improvement Plan, and despite mentoring"; and (3) two instances of "questionable decision making." *Id.* at 1736. Several Board members testified that some or all of Kelahan's stated reasons contributed to the Board's 6–1 vote to terminate Krause a few weeks later, in October. Defendants cite this testimony as a conclusive rebuttal of Krause's discriminatory discharge claim.

For the reasons set forth below, the jury was not required to either credit this testimony or to accept it as supervening in some way the pattern of discriminatory treatment that Krause's evidence depicted.

13

*1. Krause's performance evaluations*

As noted, Kelahan's first given reason was that Krause had earned low scores on performance evaluations. Under New York law, Krause was subject to a yearly evaluation process called the Annual Professional Performance Review (APPR), in which the School District rated her performance in two categories: school visits and student performance. *See* 8 N.Y.C.R.R. § 30-3.5 (2015).

For the school visits category, as the name suggests, an evaluator visited the school to assess the principal's performance. Kelahan himself, as Superintendent, acted as the evaluator for all of Krause's APPR school visits.[6] Because Krause had been a principal for less than three years and was therefore a probationary employee, Kelahan conducted three school visits each year: one pre-announced school visit in the fall and two unannounced school visits in the spring.[7] For each visit, Kelahan scored Krause's performance in various categories according to a state-approved rubric that used a four-point scale. *Id.* § 30-3.5(d)(13). At the end of the year, she would then receive one of four possible effectiveness ratings in the school visits category: Highly Effective (total score of 3.5–4); Effective (2.5–3.49); Developing (1.5–2.49); and Ineffective (0–1.49). Joint App'x 1429. This composite rating would be based on her performance across the three school visits and could also incorporate information Kelahan gathered from other sources

---

[6] New York law required that at least one school visit be conducted by the principal's supervisor and at least one be conducted by an "independent evaluator[]" who was "not employed in the same school building, as defined by BEDS code, as the principal[] they are evaluating." Joint App'x 1430; *see also* 8 N.Y.C.R.R. § 30-3.5(d)(1)(ii). While this language suggests that the supervisor and the independent evaluator will be different people, Beck testified that it was common in small school districts for the superintendent to conduct both evaluations, so long as his office was not in the same building as the principal's.

[7] For the announced school visit, Krause was informed in advance someone would be coming to the school to observe her on a particular date. For the unannounced school visits, she had no forewarning.

during the school year, such as from his review of School documents or his interactions with Krause.

The second category, student performance, used metrics such as student test scores to evaluate the principal. Again, a principal would be rated as Highly Effective, Effective, Developing, or Ineffective. 8 N.Y.C.R.R. § 30-3.5(c)(4) (2015). Then, at the end of each school year, the school visit and student performance ratings would be used to develop an overall effectiveness rating: for instance, a composite school visit rating of "Effective" and a student performance score of "Developing" would translate into an overall rating of "Effective." *Id.* § 30-3.6(a).

In Spring 2015, during Krause's first full semester as High School principal, Kelahan conducted one APPR school visit evaluation of Krause. He gave her an average score of 3.05 (in the "Effective" range).[8] Krause did not receive an overall effectiveness rating for the 2014–2015 school year, because she had worked for the School District for only a half-year by the year's close.

---

[8] Kelahan also conducted what he called an "Interim/Formative" APPR evaluation of Krause on January 15, February 10, and April 13 of 2015. Joint App'x 1756–62, *id.* at 1339/929. Kelahan testified that to complete these informal evaluations, he and Krause "had conversations about where [they each] felt she was at that moment in time." *Id.* at 1323/866. They then noted approximate scores (most of which were twos or threes) on the rubric that the School District used to evaluate principals during school visits. The evaluation did not result in a recorded APPR school visit score.

In the next academic year, on the Fall Semester announced school visit, Kelahan gave her a score of two in most categories.[9] Her average score was 2.35.[10] Joint App'x 1777–83. On her two unannounced APPR school visit evaluations in the spring, however, Kelahan's review of her performance improved in several categories and her average scores were higher: 2.82 and 2.75. *See id.* at 1763–69, 1770–76.[11] On her

---

[9] The APPR school visit evaluations are undated and multiple are not signed by Krause. Kelahan testified that the announced APPR evaluation occurred in the Fall Semester, the first unannounced occurred between January and March, and the second unannounced occurred between April and early June. He said that he showed Krause his evaluations after each visit, but Krause told the jury that she did not recognize several of the documents; as mentioned, multiple evaluations are not signed by Krause.

[10] The School District calculated the average score for Krause's Spring 2015 school visit evaluation, but not for the Fall 2015 evaluation or the two Spring 2016 evaluations. On our calculation, the (rounded) simple average of Krause's scores for those three evaluations were 2.35, 2.82, and 2.75. We note that on two evaluations for which the School District did calculate averages (the Spring 2015 school visit, and the 2015–2016 cumulative evaluation), its average calculation differs slightly from our own (by .02 and .03, respectively). In this opinion, we rely on the averages for those two evaluations as calculated by the School District.

[11] At trial, Defendants introduced an exhibit that compares over time Krause's APPR school visit scores in each category on the state-approved rubric. *See* Joint App'x 1791–92. Defendants argued in closing that Krause's performance deteriorated over time, attesting that on the four-point scale she initially received "a fair amount of fours or threes" and later received "threes, twos[,] and even a couple of ones." Joint App'x 1365/1034–1366/1035. But on our review, it appears that Defendants' exhibit is misleading, because it lists the two Spring 2016 unannounced school visits *before* the Fall 2015 announced school visit, even though Kelahan testified that the unannounced visits occurred *after* the announced one. In effect, the exhibit makes it appear as though the announced visit—Krause's worst performance and the only one on which she received any scores of one—was her final evaluation, and her scores steadily decreased over time. In reality, Krause's APPR scores slightly improved at the end of the 2015–2016 school year from the low scores she had received on the Fall 2015 announced evaluation. Indeed, in a portion of Kelahan's deposition that was read to the jury, he testified that he decided not to terminate Krause in Spring 2016 in part because of the additional APPR evaluations he conducted that semester.

In addition, Defendants' exhibit lists Krause's 2014–2015 APPR evaluation (purportedly conducted and presented to Krause in May or June of 2015) *before* the "Interim/Formative"

16

cumulative APPR evaluation for the 2015–2016 school year, Krause received a composite school visit score of 2.67 (again, in the "Effective" range, although on the lower end). *Id.* at 1784; *see also id.* at 1429 (listing numerical ranges for each school visit effectiveness rating). The record does not show what Krause's student performance or overall effectiveness ratings were for the 2015–2016 school year.

A reasonable jury might have doubted that the APPRs accurately reflected Krause's performance, since Kelahan was her only evaluator. In light of other testimony, the jury might also have concluded that the variable scores did not justify terminating Krause in October 2016: as noted, Krause's scores improved at the end of the 2015–2016 school year and it appears that her composite school visit score at the time of her termination was in the "Effective" range.

Further, even assuming Krause might have been rated "Developing" or "Ineffective" at the end of the school year—her overall effectiveness rating is not clear from the record—New York law required Kelahan to develop a Principal Improvement Plan (PIP) for her. 8 N.Y.C.R.R. § 30-2.10(a) (2015). The PIP is a written document developed by the school superintendent that identifies needed areas of improvement; sets a timeline for achieving improvement; describes how improvement will be assessed; and, if appropriate, specifies activities that will support the principal's improvement in those areas. The goal of a PIP, according to Beck's testimony, is to help a particular principal become a better leader so that she can remain in the role.

Krause and Kelahan met in March 2016 to discuss implementing a PIP for her, but Krause was never actually placed on a PIP. The jury might have wondered why

---

evaluation (purportedly conducted in January, February and April of 2015). Again, this ordering makes it appear as though Krause's scores deteriorated, when in fact she received more fours and threes on the formal evaluation in May/June than on the Interim/Formative one in January/February/April.

Kelahan attempted to place her on a PIP, when she had not been rated "Developing" or "Ineffective" at that point. It might also have wondered why he never formed or implemented the PIP, since Krause was relatively new to the job, her APPR scores had ticked upward, and she could (perhaps) be expected to further improve with guidance. Indeed, Beck testified that she was "shocked" to learn that Krause had been terminated, when the School District had an "opportunity to follow through with a PIP" and never did so. Joint App'x 1232/504. A reasonable jury could infer that Kelahan did not give Krause an adequate opportunity to improve before urging the Board to show her to the door.

2. *Krause's failure to improve despite mentoring and (assertedly) being on a PIP*

Kelahan asserted as another basis for Krause's termination that "[d]espite being on a Principal Improvement Plan, and despite mentoring, [she had] not demonstrated adequate improvement in [her] performance." *Id.* at 1736. As we have just explained, however, this assertion was at least partly false: as Kelahan now concedes, Krause was never placed on a PIP and given the feedback that a PIP would have offered. That fact, however, was apparently not communicated to Board members, two of whom testified that when they voted to terminate Krause they were not aware that she was not on a PIP. The jury might reasonably have concluded that Kelahan misled the Board and that his actions were evidence of pretext.[12]

---

[12] In addition, the jury saw evidence that Kelahan had misled the Board as to other issues. For instance, in a letter dated March 1, 2016, Kelahan informed the Board—possibly in response to an inquiry from a Board member—that it would be "inappropriate" for the Board to speak to Beck about Krause's performance, since the mentor relationship was confidential. Joint App'x 1449. He warned that involving Beck in supervisory decisions might violate New York regulations and added that, in any event, he was "absolutely sure [Beck] would not accept [the Board's] request even if asked." *Id.* At trial, however, Beck testified that Kelahan's representations were inaccurate: as a mentor, she could speak to the Board with Krause's permission and would have been willing to do so.

Further, despite Kelahan's protestations to the contrary, the jury could have credited Krause's and Beck's testimony that Kelahan never made a serious effort to adopt and implement a PIP, despite representing to the Board that he would do so. *See id.* at 1449 (Kelahan informing the Board in March 2016 that he would "be developing an improvement plan with [Krause] for the remainder of this school year"). In March 2016, Kelahan met with both Krause and Beck to discuss a proposed PIP. Krause and Beck objected that some of the stated goals set out in the draft PIP were not matters within Krause's control: for example, Kelahan supposedly wanted Krause to "make . . . faculty and staff stop talking about him."[13] *Id.* at 1127/87. Beck explained that a PIP's

In the same letter, Kelahan expressed doubts about Krause's ability to improve if placed on a PIP, writing that she was "not a new principal" and had nine years of experience as a "school administrator." *Id.* at 1449. Again, Beck testified that this description was misleading. She said that Kelahan overstated Krause's relevant experience: Krause had been an assistant principal, a role with less "substantial" responsibilities than a principal (Beck said that the assistant principal role largely consisted of "scut work" that the principal "d[id] not want to do."). *Id.* at 1234/510–11.

And in a similar vein, Krause testified that Kelahan hid from the Board positive news regarding her performance. For example, when the school received news in August 2016 that 100 percent of its students passed the Algebra II Regents Exam (up from 35 percent in the prior year), Krause wanted to show the scores to the Board, but by her account, Kelahan would not permit her to do so.

[13] Kelahan disputed that he directed Krause to have School employees stop criticizing him, and testified that the actual goal was to reduce complaints about Krause. The jury saw a marked-up copy of the proposed PIP. It included as the originally listed goals: "[d]ecrease in comments made by staff members and regional colleagues regarding dour expression/behavior" and "decrease in comments/criticisms voiced by building teachers." Joint App'x 1463. On the marked-up copy, the first of these goals is circled and includes the comment "cannot control," while the second goal is underlined. *Id.* Beck testified that Kelahan's real aim in including these items was to reduce snide comments about himself and the Board. According to Beck, Kelahan was frustrated that "a teacher or a parent had shown up at a [B]oard meeting critical of Mr. Kelahan the week before . . . the PIP plan." *Id.* at 1237/525. Beck's testimony in this regard could reasonably be understood as referring to Appler's complaint about Kelahan delivered at the March 14, 2016 Board meeting, two days before Kelahan met with Krause and Beck to discuss the draft PIP.

targets should be "measurable," and Krause could not be expected to persuade School employees to stop complaining. *Id.* at 1231/498. On Beck's advice, Krause refused to sign the proposed PIP. Kelahan reportedly agreed to make changes to the PIP after meeting with Beck and Krause, but he never followed up.

Based on these accounts, the jury could have concluded that Kelahan was never serious about implementing a PIP or helping Krause to improve.[14]

### 3. *Krause's questionable decision-making*

Finally, Kelahan cited two instances of allegedly questionable decision-making by Krause as justifications for terminating her: her "decision [in September 2016] to eliminate bells in the [H]igh [S]chool without first consulting with important stakeholders" and her purported failure that same month to follow the School District's Section 504 Policy.[15] *Id.* at 1736. Several Board members testified that these incidents— particularly the alleged Section 504 Policy violation—contributed to the Board's vote to terminate Krause. But, as explained below, the jury could reasonably have concluded that neither incident was a determinative factor.

The school bells. The first incident concerned Krause's alleged failure in September 2016 to give Kelahan, teachers, and members of the Board adequate notice that the class-change-signal bells in the High School were not functioning. Krause testified that she and her assistant, Terese Sojda, discovered a mechanical issue with the

---

[14] This conclusion is further bolstered by evidence that Kelahan had resolved to terminate Krause well before he met with her to discuss the PIP. *See* Joint App'x 1679 (Kelahan writing to the Board on February 26 that he planned on having "very confidential and very selective conversations with a couple sitting high school principals about the [anticipated] opportunity to move to Oriskany in July"); *id.* at 1716 (Kelahan writing to the Board on March 1 that, although he was preparing a PIP, his "intent [was] still to help [Krause] find a more suitable job for her skill set and to recommend termination of [her] probationary appointment").

[15] We outline the substance of this policy below, in Part IV.

bells in Spring 2016. Sojda "tried all summer," Krause said, to get the bells fixed but was unable to find someone with the expertise to fix the outdated system. *Id.* at 1130/100. Krause decided that the school should "try no bells," an approach that she believed could "create a more collegiate environment." *Id.* It is undisputed (and puzzling) that Krause did not inform teachers or the Board that there would be no bells before the start of classes. But Krause insisted that, contrary to Kelahan's representation that she did not consult with important stakeholders on the issue, she informed Kelahan that she planned on starting the year without bells, and he did not object. Sojda also told the jury that she believed Kelahan knew the bells were not working before the first day of school.

Assuming the jury credited Krause's and Sojda's testimony, it could have inferred that Kelahan later seized on the broken bell system as a post-hoc rationale for terminating Krause, even though he was aware of the issue before the school year began. In addition, the jury could have believed that the absence of bells was a minor issue—Krause presented evidence that, while the occasional teacher groused about the absence of bells, the school days proceeded without disruption. Accordingly, the jury could reasonably have found the broken bells justification to be pretextual.

The Section 504 Plan dispute. The second instance of allegedly questionable decision-making involved changes that Krause made to a student's allergy management plan. The twelve-year-old student, M., had a severe peanut and tree nut allergy and could go into anaphylactic shock if exposed to nut residue. As required by Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, the School District developed a plan to accommodate M. in light of her allergy (the "Section 504 Plan"). Under the District's Section 504 Policy at the time, a Section 504 Committee within the District was responsible for determining the special services needed by a qualifying student and developing an initial Section 504 Plan. *Id.* at 1821. In 2016, M.'s Section 504 Committee

21

included her parents; the Chair of the District's Committee on Special Education (CSE); one of M.'s teachers; and a school nurse.

At trial, Defendants argued that, under the School District's policy, M.'s Section 504 Plan could be amended only by the Section 504 Committee. According to Defendants, Krause violated this policy in September 2016 by agreeing to provisionally amend M.'s Section 504 Plan with the consent of M.'s parents but without consulting the Section 504 Committee.

The parties presented competing views and evidence about M.'s Section 504 Plan and Krause's choice to modify it in September 2016. Defendants rely on related evidence in their arguments for a new trial, and we address the evidence and arguments in more detail below, in Part IV. As relevant to Defendants' sufficiency challenge, however, the key facts are as follows.

In May 2016, M.'s parents reached out to the Guidance Office about amending M.'s Section 504 Plan. M. would be entering seventh grade in the fall and moving to the junior-senior high school building. M.'s parents felt that a new Section 504 Plan was overdue because the then-in-effect plan was overly restrictive. Krause met with M.'s parents in May, June, and August, and they agreed to try changes to M.'s Section 504 Plan.

On September 7, one day before the start of the school year, Krause emailed M.'s parents a "temporarily revised" Section 504 Plan document and informed them that the revised plan would "be in place for the first two weeks of school so we are able to assess if this plan will work." *Id.* at 1725. She proposed a meeting in the week of September 26 to discuss whether "these changes [had] worked for [M.]." *Id.* M.'s Section 504 Committee had neither convened to review nor approved these temporary changes.

22

Defendants presented several witnesses who testified that, in doing so, Krause violated the School District's Section 504 Policy because she failed to secure Section 504 Committee signoff in advance of the trial period. But the jury could have instead credited Krause's account, which was that the School District had an unwritten policy of allowing "temporary" changes to Section 504 plans without committee approval. *Id.* at 1154/196. Krause testified that CSE Chair Karen Lobdell, who was on the Section 504 Committee and was knowledgeable about the District's Section 504 Policy, advised her that she could test proposed changes to M.'s Section 504 Plan during the first two weeks of school, since the parents agreed to the trial. Beck told the jury that, in her experience mentoring New York principals, Section 504 plans were "amended or created all the time with the permission of parents." *Id.* at 1233/506–07. She explained that a sudden change of circumstances—such as a broken arm that prevented a student from writing—sometimes required schools to make changes quickly without formally consulting the Committee.

The jury also might have believed that, even if Krause violated the Section 504 Policy by making the temporary change, the error was not one that justified ending her employment. M.'s parents recalled that they were "very happy" with the temporary changes that Krause made to their daughter's Section 504 Plan. *Id.* at 1210/416. Indeed, when they learned that Krause had supposedly been placed on administrative leave in part because of the changes, they immediately emailed the Board to express concern. *See id.* at 1475 ("We have had nothing but extremely positive interactions with Ms. Krause when dealing with the new school year, the 504 plan and [M.'s] transition to the high school.").

* * * * *

In sum, for the reasons set forth above, the District Court properly rejected Defendants' sufficiency challenge to the jury's verdict. A reasonable jury could have

concluded that (1) Kelahan mistreated Krause because of her sex; (2) Krause was an adept and developing principal who was thwarted at every turn by Kelahan, who had created a hostile work environment; and (3) the School District's stated non-discriminatory reasons for terminating Krause were pretextual. These conclusions provide an ample basis for the jury's finding that sex was a motivating factor in Defendants' decision to terminate Krause.

## II. The District Court did not err by allowing Krause to seek monetary damages.

Apart from their challenge to the jury's liability decision, Defendants submit that the District Court's summary judgment ruling should have precluded Krause from pursuing lost-income damages. They therefore contend that the District Court erred by denying their motion to amend the judgment to eliminate the portion of the award that covered Krause's lost income. Largely for the reasons offered by the District Court, *Krause*, 575 F. Supp. 3d at 313–14, Defendants' argument fails.

Defendants assert that the District Court's dismissal of Krause's equal protection claims at summary judgment precluded her from recovering lost-income damages on her Title VII claims. The court held at summary judgment that Krause had not established that gender discrimination was a but-for cause of her termination, which was a requirement for her equal protection claim. *Krause*, 2020 WL 2838859, at *20. The court allowed Krause to proceed on certain of her Title VII claims, however, because to prove those claims Krause needed to establish only that her gender was a "motivating factor" in (not a but-for cause of) Defendants' decision to terminate her employment. *Id.* at *20–21.

Defendants point out that, as discussed above, they have a partial defense to a Title VII motivating factor claim if they show that they "would have [made the same termination decision] in the absence of the impermissible motivating factor." 42 U.S.C.

24

§ 2000e-5(g)(2)(B). When defendants prevail on this defense, Title VII limits the plaintiff's remedies: she can obtain "declaratory relief, attorney's fees and costs, and some forms of injunctive relief," but not "monetary damages and a reinstatement order." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 349 (2013). The District Court effectively ruled in their favor on this defense, Defendants say, when it concluded at summary judgment that Krause had not shown discrimination was a but-for cause of her termination for the purpose of her equal protection claim.

The District Court's summary judgment ruling did not have the preclusive effect that Defendants assert. On Krause's equal protection claim, it was *her* burden to establish that discrimination was the but-for cause of her termination. *See Naumovski v. Norris*, 934 F.3d 200, 214–15 (2d Cir. 2019). Under Title VII, in contrast, *Defendants* bore the burden of establishing the same-decision defense, *i.e.*, that they would have terminated Krause even absent a discriminatory motive. *Univ. of Tex. Sw. Med. Ctr.*, 570 U.S. at 349. At summary judgment, the District Court never considered the question that would be required to find in Defendants' favor on this defense: whether, with the burden of proof resting on Defendants, they had established that they would have inevitably terminated Krause for non-discriminatory reasons. Nor should the District Court have decided this issue, given that Defendants never raised a same-decision defense in their summary judgment briefing. They cannot now claim that the District Court erred in failing to reach an issue that they did not squarely present.[16]

---

[16] Even if the District Court should in some way have reached this issue at the summary judgment stage, this Court will not ordinarily hear a post-trial challenge to a district court's summary judgment ruling. *See Pahuta v. Massey-Ferguson, Inc.*, 170 F.3d 125, 129–30 (2d Cir. 1999). Instead, the Court considers whether the jury's verdict was supported by sufficient evidence. *Id.* at 130–31. Here, the jury concluded that Defendants had not "established by a preponderance of the evidence that they would have made the same decision [to terminate Krause] in the absence of gender discrimination." Joint App'x 1909 (verdict form). That verdict was supported by substantial evidence, as we described in Part I.

25

## III. The asserted errors in the District Court's evidentiary rulings do not warrant a new trial.

Defendants next argue that they are entitled to a new trial because of asserted errors in certain of the District Court's evidentiary rulings. A new trial is warranted if the District Court made "substantial errors . . . in admitting or excluding evidence." *Stampf v. Long Island Ry. Co.*, 761 F.3d 192, 202 (2d Cir. 2014). We review the District Court's evidentiary ruling under an abuse of discretion standard, reversing "only if the ruling was arbitrary and irrational." *United States v. Abu-Jihaad*, 630 F.3d 102, 131 (2d Cir. 2010). Further, even an erroneous decision does not require retrial if it is harmless—that is, if we can "say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error." *Matusick v. Erie Cnty. Water Auth.*, 757 F.3d 31, 50 (2d Cir. 2014).

Defendants' opening brief in this appeal takes issue with dozens of evidentiary rulings by the District Court. Below, we focus on their primary arguments.[17] As to each

---

[17] We decline to address the many points that Defendants raise for the first time on appeal. *See In re Nortel Networks Corp. Sec. Litig.*, 539 F.3d 129, 132 (2d Cir. 2008) ("It is a well-established general rule that an appellate court will not consider an issue raised for the first time on appeal."). While this Court has discretion to consider arguments forfeited below "where necessary to avoid a manifest injustice," *id.* at 133, that circumstance is not present here.

Further, we need not address issues that Defendants raised in their post-trial briefing below in only the most cursory manner. *See Norton v. Sam's Club*, 145 F.3d 114, 117 (2d Cir. 1998). Defendants relegated many of their arguments to a bullet-pointed list at the end of their memorandum of law. Although they elaborated on some of these points in an affidavit from defense counsel and in their reply brief, the District Court reasonably treated as forfeited any arguments not raised in the memorandum of law, *Krause*, 575 F. Supp. 3d at 307–08, and Defendants do not challenge that ruling on appeal.

In the proceedings below, Defendants also neglected to refer the District Court to relevant pages of the trial record, adding to the confusion created by their too brief explanation of many of their arguments. Indeed, Defendants did not even provide the District Court with a trial transcript, apparently based on the mistaken belief that such transcripts are used only on

point, we either identify no error or conclude that, even if one or more of the challenged rulings was erroneous, a new trial is not warranted.

### A.    Rule 401 and 403 objections

To start, Defendants contend that the District Court erred by allowing Krause to introduce irrelevant and prejudicial evidence. Evidence is admissible only if it is relevant, in that "it has any tendency to make a fact [of consequence in determining the action] more or less probable than it would be without the evidence." Fed. R. Evid. 401. If relevant, furthermore, its probative value must not be "substantially outweighed" by the potential for unfair prejudice. Fed. R. Evid. 403. When assessing claims of relevance and undue prejudice, our review "is highly deferential in recognition of the district court's superior position to assess relevancy and to weigh the probative value of evidence against its potential for unfair prejudice." *United States v. Coppola*, 671 F.3d 220, 244 (2d Cir. 2012).

We conclude that the District Court did not abuse its discretion when it determined that the contested evidence was relevant and not unduly prejudicial.

---

appeal. It is hard to see *how* the District Court could be expected to recall enough detail about Defendants' many specific evidentiary objections to decide whether on reconsideration any of its rulings were erroneous and prejudicial. Unsurprisingly, Defendants' vague briefing below and the lack of record citations sometimes made it impossible for the District Court to identify the rulings as to which Defendants were renewing their objections. *See, e.g.*, *Krause*, 575 F. Supp. 3d at 311–12 (struggling to evaluate Defendants' hearsay argument because of Defendants' "failure to cite to specific instances with support from the transcript"); *id.* at 313 (declining to resolve a dispute over foundation for an exhibit in Defendants' favor because Defendants had not provided the trial transcript or cited "evidentiary support"). Courts are not obligated to invent arguments that parties do not make or to scour the record for support for the parties' claims.

### 1. Testimony given by M.'s parents

Defendants first assert that the District Court improperly allowed Krause to introduce irrelevant and prejudicial testimony from M.'s parents about their frustrations with the School District.[18]

As explained above, one of Defendants' stated reasons for terminating Krause was that she changed M.'s Section 504 Plan without consulting the Section 504 Committee. At trial, M.'s parents, Michelle and Matthew Denison, testified about their long-running dispute with the School District regarding M.'s Section 504 Plan. Their view, as they explained it to the jury, was that the Section 504 Plan isolated their daughter. For instance, it required M. to go to the nurse's office by herself during other students' birthday celebrations. It also required her to sit in a designated seat on the school bus and at a particular "peanut-free table" in the cafeteria. Joint App'x 1219/452. This often meant sitting alone. In addition, the Denisons said that their daughter was being bullied because of her allergy. Both before and after M. arrived at the High School, Mr. Denison testified, students at the school "threatened" M. by "putting . . . peanuts in her book bag, peanuts in her face." *Id.* at 1215/436. He felt that the School District minimized the family's concerns about bullying.

The District Court concluded that this evidence was relevant and not unfairly prejudicial, and we agree. As the District Court reasoned, the Denisons' history with the School District before Krause's appointment explained "why the Denisons were relieved—rather than upset—by [Krause's] altering [M.'s Section 504 Plan] outside of

---

[18] Defendants also assert that much of the rest of M.'s parents' testimony was irrelevant and prejudicial, including their description of their unsuccessful efforts to reach Lowell in Summer 2016; their account of how the School District handled M.'s Section 504 Plan after Krause was fired; and their speculation that Kelahan retaliated against them for advocating on behalf of their daughter. Defendants did not object to this testimony during trial and have therefore forfeited this argument.

the [Section 504 Committee process]." *Krause*, 575 F. Supp. 3d at 310. It also provided context as to why Krause may have moved expeditiously to make a temporary change to M.'s Section 504 Plan, without waiting for the Section 504 Committee. And it undermined Defendants' claim that Krause's actions increased the chances that M. would be harmed or that the Denisons would sue the School.

### 2. *Zumbrun's 2018 complaints*

Defendants also fault the District Court for admitting evidence about complaints that Colleen Zumbrun, the Guidance Office Assistant, submitted to the Board in 2018, after Krause's termination in October 2016. Zumbrun told the jury that after Krause left, CSE Chair Melissa Lowell began harassing Zumbrun. Zumbrun was also allowed to testify that in May 2018—more than a year after Krause was terminated—Zumbrun complained to the Board, "begging [it] to please do something about the unprofessionalism" in the School District. Joint App'x 1176/282. In a similar vein, the District Court allowed as an exhibit a written copy of the remarks that Zumbrun and her husband read to the Board, in which Zumbrun alleged that the School had become a "hostile, un-peaceful work environment" due to "power hungry" administrators, particularly Lowell. *Id.* at 1498.

Defendants and the dissent urge that this evidence was irrelevant and therefore inadmissible because Zumbrun submitted her complaints after Krause and Kelahan left the School District[19] and because Zumbrun did not expressly allege that gender discrimination led to the issues she flagged. But Zumbrun's complaints describe the environment during Krause's tenure as principal and therefore support Krause's hostile work environment claims. They also help establish that the "chaotic" environment at

---

[19] Kelahan left the School District in July 2017, when he accepted a position as Superintendent for the Watkins Glen School District.

the School, Joint App'x 1288/727, which Defendants attributed to Krause, might have been the result of factors outside her control. And they show that even years after Krause complained to the Board about a hostile work environment, the Board was slow to take steps to improve the dysfunctional workplace that continued in her absence. The District Court did not abuse its discretion by admitting this evidence.

B.      Hearsay objections

Another basis for a new trial, Defendants contend, is that the District Court allowed Krause to introduce certain purportedly inadmissible hearsay testimony. In particular, Defendants take issue with the admission of Zumbrun's testimony about out-of-court statements made by Krause's assistant, Terese Sojda, and Lowell's assistant, Kathleen Higgins. Zumbrun told the jury that during lunchtime conversations—sometimes with Krause present—Sojda and Higgins expressed "disbelief" about Kelahan's behavior and said "over and over" that "this wouldn't happen if [Krause] were a man." *Id.* at 1172/268–1173/269. Over defense counsel's objection, the District Court admitted this evidence under Federal Rule of Evidence 801(d)(2)(D), which defines as non-hearsay statements made by a party's employee "on a matter within the scope of [the employment] relationship and while it existed."

We need not decide the merits of this contention because Defendants did not adequately raise this issue before the District Court and accordingly have forfeited their argument that the evidence's admission warrants a new trial. In the District Court, Defendants asserted in post-trial motions that Krause was erroneously "allowed to present testimony, largely in hearsay form, that she suffered harsher treatment at [Kelahan's] hands than previous male principals." Dist. Ct. Dkt. No. 175-2 at 3. This one-sentence statement was all their opening brief had to say on this issue. As the District Court pointed out in ruling on the motion, Defendants identified no specific instances of the testimony whose admission they found objectionable, thus creating a

significant and undue challenge for the court: several witnesses testified about how Kelahan's treatment of Krause compared to his treatment of prior principals. *See Krause*, 575 F. Supp. 3d at 311–12 (considering different possible testimony to which Defendants might be objecting). In these circumstances, the District Court committed no error when it failed to consider an argument about specific testimony that Defendants never made.

And even if admission of this testimony was improper, it is difficult to see how it "affected the outcome of the case," as the dissent contends. Dissent at 5 (quoting *Tesser v. Bd. of Educ. of City Sch. Dist. of City of N.Y.*, 370 F.3d 314, 319 (2d Cir. 2004)). In fact, Defendants later called Sojda and Higgins, whose statements Zumbrun was relaying, to testify about those statements; they denied making them. Defense counsel prominently highlighted that contradictory testimony during closing argument. Zumbrun was also just one of several witnesses who testified regarding the differential treatment Krause alleged that she received. *See supra* Part I.

The jury, then, was presented with reasons to discount Zumbrun's testimony on this point, and this minimized any prejudicial effect of the now-charged evidentiary error. It also had before it other evidence consistent with Zumbrun's assertions, and this supported the outcome even without the objected-to testimony.

C.    Rule 615 argument

Defendants also contend that the District Court's comments at trial infringed the School District's right to designate a representative under Federal Rule of Evidence 615. Rule 615 provides that certain individuals, including the parties, may always attend the trial and cannot be excluded by the District Court. If a party is not a natural person, its counsel can designate a representative to attend on its behalf. *See* Fed. R. Evid. 615(a)(2). CSE Chair Lowell was the School District's and the Board's designated representative during the trial. In the relevant portion of Lowell's testimony, Plaintiff's counsel asked

Lowell a question about the School District's and the Board's response to the broken school bells. Defense counsel objected, and the District Court overruled the objection, stating: "She is the representative of the [School District and the Board] that is designated by you. I would expect she would have some answers to these questions." Joint App'x 1274/671.

Even assuming that the court's comment improperly suggested that Lowell's status as a Rule 615 representative obligated her to know the answer to certain questions—Rule 615 requires no such thing—the comment does not warrant a new trial. Defendants have not explained how the court's brief remark prejudiced them. Lowell was able to answer the questions asked. In addition, the record provides no basis for believing that the District Court's response to the objection meaningfully impeded Defendants' right under Rule 615 to designate a representative to attend the trial, let alone that it undermined the fairness of the trial.

D.    Other evidentiary rulings challenged by Defendants on appeal

Finally, Defendants urge that the District Court abused its discretion by preventing Lowell from testifying about Zumbrun's reputation for truthfulness, and by preventing Kelahan from comparing Krause's alleged performance issues to those of prior principals. Again, these arguments fail.

1.  *Zumbrun's reputation for truthfulness*

According to Defendants, the District Court improperly barred them from attacking Zumbrun's credibility by showing that she had a "reputation for untruthfulness." Appellants' Br. 31; *see* Fed. R. Evid. 608(a). During defense counsel's direct examination of CSE Chair Lowell, he asked about "Zumbrun's reputation in the school district for honesty." Joint App'x 1263/628. The District Court sustained Plaintiff's objection on the ground that defense counsel failed to establish a foundation

32

for the question. The District Court's ruling was correct. Defense counsel had not yet shown that (1) Zumbrun had a reputation for dishonesty in the School District; and that (2) Lowell had reason to know of that reputation—*e.g.*, from working closely with Zumbrun or discussing her reputation with others. Counsel was given an opportunity to reformulate the question, but still did not establish these baseline facts.

### 2. *Testimony about prior School principals*

The District Court also sustained Plaintiff's objections to Defendants' questions to Kelahan about (1) whether he received more frequent complaints about Krause than about prior principals, and (2) whether prior principals had engaged in conduct "comparable to" Krause's amendment of M.'s Section 504 Plan. *Id.* at 1315/833. Defendants now challenge these rulings as well.

Any error in sustaining the objections was harmless. Kelahan was ultimately permitted to testify that the complaints he received about other principals were "[m]uch less severe, very low-level," and "[v]ery infrequent, mundane, . . . run-of-the mill." *Id.* He also told the jury that he had no "serious issues" with Krause's predecessor. *Id.* at 1305/794. Four other witnesses agreed that Krause's performance was worse in various respects than that of prior principals. Thus, even if erroneous, these rulings hardly made the trial an unfair one or otherwise warranted overturning the jury's verdict.

*       *       *       *       *

For all these reasons, the District Court's evidentiary rulings were not an abuse of discretion; any error was harmless; and Defendants are not entitled to a new trial. We therefore turn to Defendants' primary remaining argument for a new trial: the District Court's statement about the New York laws governing Section 504 Plans.

33

**IV.** **The District Court's mistaken comment about Education Law § 4402 was not sufficiently harmful to warrant a new trial.**

As we have described, one of the justifications that the School District offered for its decision to terminate Krause's employment was that she temporarily changed M.'s Section 504 Plan without first consulting with the Section 504 Committee. Defendants' related argument is that the District Court committed reversible error by suggesting incorrectly to the jury in a brief comment that Krause adhered to the state-mandated procedures in N.Y. Education Law § 4402 when she amended the Section 504 Plan.

**A.** The District Court's remark

The court made the remark at issue here while defense counsel was cross-examining Margaret Beck, Krause's BOCES mentor. Immediately before the contested comment, defense counsel had read the jury part of the text of N.Y. Education Law § 4402. That law governs individualized education plans (IEPs), a type of accommodation plan for disabled students, but does not apply to Section 504 Plans. Defense counsel read aloud the text of a subclause of the law, § 4402.1.b(3)(b)(ii), that allows New York school districts to modify a student's IEP without a committee (CSE) meeting if the parents agree in writing to the changes.

As defense counsel continued questioning Beck, the following interaction occurred:

> DEFENSE COUNSEL: Now, Ms. Beck –
>
> THE COURT: Now, before we go any further, *you have heard the law concerning the 504. Whether or not the Oriskany Central School District complied with that law, followed it or made changes*

34

*or made informal parts is an issue that you may have to consider in determining this case.* Next question.

DEFENSE COUNSEL: Your Honor, I must raise an objection to that instruction. You said it was the law –

THE COURT: So noted and let's get on with your cross-examination, if you wish, or are you finished?

*Id.* at 1236/521 (emphasis supplied).

Defendants posit that the court's remark was erroneous in multiple ways. First, they say, by seeming to refer to Education Law § 4402 as "the law concerning the 504," the court mistakenly suggested that it applies to Section 504 Plans. By its plain text, Education Law § 4402 is specific to IEPs and does not say anything about Section 504 Plans. And as several witnesses explained during the trial, IEPs and Section 504 Plans have important differences: the two are subject to different federal and state laws and cover different groups of disabled students.[20] In its brief comment, Defendants say, the District Court mistakenly conflated IEPs and Section 504 Plans.

---

[20] A school district creates an **individualized education plan (IEP)** pursuant to its obligations under the Individuals with Disabilities in Education Act (the "IDEA"), 20 U.S.C. § 1400 *et seq*. To be eligible for an IEP, a student must have "one or more of an enumerated list of impairments requiring 'special education or related services.'" *B.C. v. Mount Vernon Sch. Dist.*, 837 F.3d 152, 159 (2d Cir. 2016) (quoting 20 U.S.C. § 1401(3)). The federal and state governments implement the IDEA in partnership. The regulatory scheme implementing the IDEA is comprehensive: federal and state law provide specific procedures that school districts must follow to evaluate whether a student has a qualifying impairment, to create an IEP, and to modify that IEP. *See* 20 U.S.C. § 1415; 34 C.F.R. § 300.1 *et seq*.; N.Y. Educ. Law § 4401 *et seq*.; 8 N.Y.C.R.R. § 200.1 *et seq*. One of these state laws is Education Law § 4402, which bears only on IEPs.

In contrast, **Section 504 Plans** are governed by Section 504 of the Rehabilitation Act, 29 U.S.C. § 794. Section 504 defines "disability" broadly, and differently than does the IDEA. A student has a "disability" under Section 504 if she (1) has "a physical or mental impairment that substantially limits one or more major life activities"; (2) has "a record of such an impairment"; or (3) is "regarded as having such an impairment." 42 U.S.C. § 12102(1); 29 U.S.C. § 705(20)(B). Section 504's coverage therefore extends beyond the specific impairments enumerated in the

The District Court then compounded the error, in Defendants' view, by raising the possibility that Defendants might not have "complied with" Education Law § 4402. *Id*. According to Defendants, the court effectively told the jury that the School District violated state law if it prevented principals from amending Section 504 Plans as Krause did here.

In doing so, Defendants argue, the District Court undermined one of the non-discriminatory justifications they offered for Krause's termination. As we have described, in September 2016, Krause agreed to try out proposed amendments to M.'s Section 504 Plan at the request of M.'s parents. *See id.* at 1725 (email from Krause dated September 7, 2016: "Attached to this e-mail is a temporarily revised [Section 504 Plan] for [M.] . . . . As we discussed, this will be in place for the first two weeks of school so we are able to assess if this plan will work."). At trial, Defendants elicited testimony from several witnesses—Kelahan, CSE Chairs Karen Lobdell and Melissa Lowell, and Board Members Michelle Anderson and Robyn Appler—that the School District's Section 504 Policy does not allow a school principal to amend a Section 504 plan without Section 504 Committee approval, even on a temporary trial basis. Krause violated the Section 504 Policy, Defendants maintained, by circumventing the Section 504 Committee in M.'s case.

---

IDEA: for instance, it covers students like M., with severe allergies requiring attention in the school context, but which do not necessarily fit within the list of impairments that require "special education or related services" under the IDEA. In addition, unlike the IDEA, Section 504 does not prescribe procedures for school districts to use in determining accommodations. School Districts must at minimum implement "a system of procedural safeguards that includes notice, an opportunity for the parents or guardian of the person to examine relevant records, an impartial hearing with opportunity for participation by the person's parents or guardian and representation by counsel, and a review procedure." 34 C.F.R. § 104.36. But they have flexibility to choose which procedures to implement.

In contrast, Krause took the position that the School District had an unwritten policy of allowing temporary changes to a Section 504 plan without Committee approval. Her counsel pointed out that while the Section 504 Policy directs the Committee to review a student's Section 504 Plan annually, the policy is not explicit about how the School can change the Section 504 Plan in the period between annual reviews.[21] It does not expressly preclude the School District from adopting a procedure to amend Section 504 plans with the consent of parents, like Education Law § 4402's procedure for amending IEPs. Krause testified that CSE Chair Lobdell (who served in that role until June 2016) and CSE Chair Lowell (who took over from Lobdell in June 2016) both approved the idea of testing temporary changes to M.'s Section 504 Plan in the opening two weeks of the new school year. Beck told the jury that Section 504 plans are "amended or created all the time with the permission of parents." *Id.* at 1233/506–07. She explained that a sudden change in circumstances might require a school district to implement accommodations quickly. Based on her experience mentoring New York principals, she said, it was her view that Krause did not violate Section 504 when she made temporary changes to M.'s Section 504 Plan.[22]

---

[21] As relevant here, the Section 504 Policy directs that Section 504 Committee "will monitor the progress of the disabled student and the effectiveness of the student's education plan annually to determine whether special education, related services or accommodations are appropriate and necessary, and that the disabled student's needs are being met as adequately as the needs of the nondisabled students." Joint App'x 1822. It also provides that the Committee "shall be responsible for determining what special services are needed" for students with a disability that is covered by Section 504. *Id.* at 1821.

[22] On cross-examination, Defendants sought to undermine this testimony by establishing that while Beck understood how New York school districts generally managed Section 504 plans, she had never reviewed the Oriskany Section 504 Policy. They pressed Beck to explain why she believed that Section 504 plans could be changed without a Section 504 Committee meeting in Oriskany; in response, Beck cited the New York laws implementing the IDEA. It was at this point that defense counsel read Education Law § 4402.1.b(3)(b)(ii), the New York law to which Beck was likely referring, and the Court made its challenged comment. Defense counsel later

As we explained in Part I, based on the evidence at trial, Krause's belief that she could temporarily amend the Section 504 Plan seems at least plausibly sensible. But the parties debated the legality of this approach, and the question whether her action contravened the law was undoubtedly important for Defendants' position. A possible misstatement of law by the District Court in connection with this issue thus demands our close attention.

In assessing whether the court's statement merits a new trial, however, "we determine not whether the trial judge's conduct left something to be desired, but rather, in light of the record as a whole, whether the judge's behavior was so prejudicial that it denied a party a fair, as opposed to a perfect, trial." *Manganiello v. City of New York*, 612 F.3d 149, 169 (2d Cir. 2010); *see also Rivas v. Brattesani*, 94 F.3d 802, 807 (2d Cir. 1996) ("[D]ue process requires a fair trial rather than a perfect trial."). For the reasons explained below, we are not persuaded that Defendants were denied a fair trial by this single, brief, confusing comment by the trial judge over the course of a six-day trial.

B.      The District Court's comment does not warrant a new trial

Defendants advance the view that in his remark the District Court "directly told the jury – incorrectly – that the School District was required by [Education Law § 4402] to allow Ms. Krause to agree to changes to the student's [Section 504 Plan] without involvement of a [Section] 504 [C]ommittee." Appellants' Br. 51. The comment, they say, inevitably led the jury to conclude that Defendants "could not terminate [Krause] for agreeing to change the [Section 504 Plan], regardless of the School District's internal policy." *Id.* at 51–52. Thus, in two brief sentences, the court purportedly eliminated a key non-discriminatory ground presented by Defendants for Krause's dismissal. They

_____

explained that his goal in reading the text of § 4402.1.b(3)(b)(ii) was to show that it was specific to IEPs and did not apply to Section 504 plans. Counsel hoped to persuade the jury that Beck was "mixing up" the respective procedures for IEPs and Section 504 plans. *Id.* at 1237/523.

38

further argue that the District Court should have clarified in its closing instruction, as they later requested, that Education Law § 4402 did not apply to Section 504 Plans.

We are not persuaded that this was reversible error. Viewing the District Court's comment "in light of the record as a whole," *Manganiello*, 612 F.3d at 169, and assessing the overall risk of confusion in this area, it strikes us as improbable that the jury was "substantially swayed" by the court's brief comment. *Matusick*, 757 F.3d at 50. Any error in the court's remark does not warrant a new trial.

As a preliminary matter, Defendants overstate the nature and force of the District Court's comment. First, the comment was somewhat garbled (understandably so, in light of the overlapping statutes full of terms of art). The District Court began by telling the jury that it had "heard the law concerning *the 504*," Joint App'x 1236/521 (emphasis supplied)—odd phrasing, and by no means a clear instruction that Education Law § 4402 applies to Section 504 Plans. Presumably, the court intended to refer to "the 504 issue," as it had done before the text of Education Law § 4402 was read. *See id.* at 1236/518 ("[L]et's let the jury see what the section says that is part of the 504 issue."). It appears the judge simply misspoke. And the judge's next comment was equally hard to follow: he told the jury that it "m[ight] have to consider" whether the School District "complied with that law, followed it[,] or made changes[,] or made informal parts." *Id.* at 1236/521.

The jury may well have been confused after hearing these observations. But we are hardly convinced that, as Defendants urge, the District Court "directly told the jury . . . that the School District was required by *law* to allow Ms. Krause to agree to changes to the student's [Section 504 Plan] without involvement of a [Section] 504 [C]ommittee." Appellants' Br. 51. The court's pronouncement was anything but "direct." And the trial judge certainly did not instruct the jury that Education Law

§ 4402 mandated any specific procedures that Krause (or the School District) had or had not followed.

The dissent finds the District Court's statement, and its implications, "clear[]" enough. Dissent at 2. But tellingly, it too has to supply additional words to the quote to find that clarity. *See id.* (adding "[section]" and "[plan]" to "the 504"). And reading the reference to "the 504" to mean "the section 504 *plan*," *id.* (alterations omitted and emphasis supplied), rather than "the 504 *issue*," as the District Court had described it moments earlier, Joint App'x 1236/518 (emphasis supplied), is far from the only and obviously correct resolution. When defense counsel asked to read the text of Section 4402 into evidence, Krause's counsel objected, disputing its pertinence. Joint App'x 1236/518. The District Court allowed the section to be read still, explaining that "[j]urors should be allowed to see the appropriate section" and "[w]hether it's pertinent or not will have to be decided later." *Id.* The Court added that "[Krause] may very well have a good argument at that point, but let's let the jury see what the section says that is part of the 504 issue." *Id.* Thus, the jury could reasonably have understood "the 504" as a reference to "the 504 issue"—that is, the issue whether Section 4402 is pertinent or not, which the parties had just disagreed on—rather than, as the dissent suggests, a declaration that Section 4402 definitively governs Section 504 plans.

In any event, if the court's remark created an opportunity for Krause to argue that Education Law § 4402 authorized the changes to M.'s Section 504 Plan, she did not take advantage of the opening. At trial, Krause's account was that she followed the procedure that CSE Chair Lobdell recommended: test proposed changes to the Section 504 Plan for a two-week period and then convene the Section 504 Committee to consider making a formal amendment.

Contrary to Defendants' assertion on appeal, Krause's counsel never argued that Education Law § 4402 "permitted her to change" M.'s Section 504 Plan. Appellants' Br.

49. Instead, she maintained that state and federal law and the Section 504 Policy did not *prohibit* temporary changes, and that the School District had an unwritten practice of allowing them.[23] Krause readily acknowledged that IEPs and Section 504 plans are subject to different rules. Defendants offer no record citation for their assertion that Krause relied "extensively" on Education Law § 4402 at trial, Oral Argument Tr. at 3:40–4:05, and our review of the record finds no support for their claim.

In large part *because* Krause did not focus on Education Law § 4402, the judge's brief comment on that law turned out to be peripheral to the main dispute at trial. Rather, the key issue was whether Krause had consulted CSE Chairs Lobdell and Lowell and secured their approval before making the temporary change to M.'s 504 Plan. All witnesses agreed that any change to a Section 504 Plan *or* an IEP, be it temporary or permanent, must be approved by at least the CSE Chair (who also managed the Section 504 Committee). Even Beck, who said she thought that Section 504 plans could be changed without convening the Section 504 Committee, advised Krause to follow the CSE Chair's direction regarding the proposed change to M.'s plan. And at trial, Krause said she did follow the directions of Lobdell, whom she viewed as the authority on the laws and policies governing Section 504 Plans. So, whatever state law

---

[23] Krause's counsel also suggested, in an interesting tack, that if the School District *did* have different procedures for amending IEPs and Section 504 plans, such differential treatment might violate the Rehabilitation Act. Of course, this argument does not rely on Education Law § 4402; in fact, it seems to implicitly acknowledge that no *express* statutory or regulatory provision requires School Districts to allow changes to a Section 504 plan that are consented to by the parents. Thus, far from "le[aving] the jury with the false impression that section 4402 applied to both IPEs and to 504 accommodation plans" as the dissent claims, Dissent at 3, Krause's bank-shot argument seems to accept that Education Law § 4402 does not, of its own force, apply to Section 504 plans. Although Krause's legal argument in this instance strikes us as dubious, Defendants have not argued that the District Court erred by allowing Plaintiff's counsel to tell the jury that the School District's Section 504 Policy might violate the Rehabilitation Act (as opposed to Education Law § 4402 itself), so we need not decide the question here.

required—something no witness seemed to fully comprehend[24]—all agreed Krause could not responsibly proceed without consulting the CSE Chair. The jury had to decide whether she did so. The judge's somewhat confusing comment did not bear on that question.

Finally, the judge's comment does not entitle Defendants to a new trial for an additional reason as well: Defendants themselves appear to have played a significant role in causing the District Court's purported error. Over the course of the litigation,

---

[24] Witnesses from both sides offered contradictory testimony about the federal and state laws governing Section 504 Plans and IEPs. Lowell initially agreed that the School could modify *both* IEPs and Section 504 plans without a Committee meeting, but only "[w]ith a signed amendment from the parents and the CSE chair or the [Section 504 Committee Chair] being involved." Joint App'x 1270/653. But she later testified that while state and federal law permitted modifications to IEPs and Section 504 plans without a committee meeting, there was "a different practice at Oriskany because of the policies." *Id.* at 1270/654. And she also clarified that the state regulation that implements Education Law § 4402, 8 N.Y.C.R.R. § 200.4(d)(2), applies only to IEPs.

Lobdell, in contrast, initially testified that *neither* IEPs or Section 504 plans can be amended unless the School held a committee meeting. Presented with an excerpt of Education Law § 4402.1.b(3)(b)(ii) that permits amendments to IEPs without a committee, Lobdell pointed out that the statute did not refer to Section 504 plans. But when asked if she was "saying that 504 plans require a meeting to change the plan . . . and an IEP does not," she denied that too, responding, "I was always under the understanding that an IEP required the committee." *Id.* at 1397/70. Later in her testimony, she insisted that she never temporarily changed an IEP or Section 504 plan without committee approval. But then, when shown evidence that she *had* in fact agreed to test changes to IEPs without convening the committee (but with the parents' consent), she finally said that IEPs could be amended if the parents agreed, while Section 504 plans could not be.

Adding to the confusion, Board Member Robyn Appler told the jury that "each child needs to go through the same [committee] process, whether it be a [Section 504 plan] or an IEP." *Id.* at 1185/318. Board Member Michelle Anderson testified that changes to IEPs would sometimes be "tried before they [were] actually put in as an amendment," *id.* at 1300/776, but then said that there was no similar opportunity to amend Section 504 plans without committee approval, *id.* at 1301/780. Finally, both defense counsel and Kelahan advised the jury—apparently without offering any supporting citation—that either federal law or state law (or both) required the Section 504 Committee process.

42

Defendants took inconsistent positions about whether Education Law § 4402 applied to Section 504 plans. For example, at summary judgment, they posited that Education Law § 4402 requires schools to "establish committees and/or subcommittees for the evaluation and placement of students with handicaps," including students with Section 504 plans. Dist. Ct. Dkt. No. 78-46 at 17. Their Local Rule 56.1 statement of material facts represented that Section 504 plans are "governed by . . . state law (New York Education Law § 4402) and regulation (8 N.Y.C.R.R. § 200.3)." Joint App'x 451 ¶ 89. They also submitted affidavits from Lobdell and Lowell attesting that Education Law § 4402, among other state and federal laws, mandated the Section 504 Committee process.[25] Defendants' assertions about Education Law § 4402, in fact, helped them to secure partial summary judgment on Krause's equal protection claim. *See Krause*, 2020 WL 2838859, at *18 (describing Education Law § 4402 as one of "several regulations requiring that changes to a student's [Section] 504 plan be handled by a committee").[26]

It was not until Beck's cross-examination (and even then, not until after the court made the disputed comment) that defense counsel first suggested that Education Law § 4402 governed only IEPs. It is no surprise, then, that the trial judge may have believed

---

[25] At trial, Lobdell and Lowell at times asserted that the procedures for amending IEPs and Section 504 plans were different. But their summary judgment affidavits told a different story. *See* Joint App'x 140 ¶ 5 (Lobdell attesting that "[u]nder no circumstances may a single administrator . . . agree with a parent to make or . . . 'try out' changes to the arrangements set forth in an IEP or a [Section] 504 Plan"); *id.* at 152–53 ¶ 13 (Lowell attesting that "IEPs and [Section] 504 plans may only be changed through properly convened committee or subcommittee meetings, and it is very elementary knowledge that a principal cannot simply make such changes on the fly, even with the parents' agreement").

[26] As do Defendants, the dissent overstates the importance of the District Court's comment, characterizing Defendants' "principal defense at trial" as "hinged on" the distinction between IEP plans and Section 504 plans. Dissent at 1–2. But, again, it is hard to see how this issue could have played such a foundational role to their argument when Defendants themselves had successfully persuaded the District Court at the summary judgment stage that such a distinction did not exist. *See* Dist. Ct. Dkt. No. 78-46 at 17; *Krause*, 2020 WL 2838859, at *18.

43

that Education Law § 4402 applied to Section 504 plans: Defendants had told him as much. With this background, and in light of Defendants' changing positions—and their own role in causing the District Court's purported error—justice simply does not require a new trial.[27] Fed. R. Civ. P. 61 ("Unless justice requires otherwise, no error . . . by the court . . . is ground for granting a new trial."); *see also Rivas*, 94 F.3d at 807 (explaining that courts should grant a new trial if the original one "was not fair to the moving party"). Indeed, if the District Court *had* instructed the jury that Education Law § 4402 did not apply to Section 504 plans, as Defendants requested later in the trial, that instruction would have directly contradicted the affidavits submitted by two of Defendants' key witnesses—not to mention the court's own summary judgment ruling. Under these unusual circumstances, the District Court did not abuse its discretion by choosing to say no more about Education Law § 4402.

\* \* \* \* \*

We have considered the remaining issues raised by Defendants' brief and conclude that none of them warrants a new trial. Like all trials, this one was not perfect; we can conclude with confidence, however, that it was fair to both parties. Defendants are not entitled to a do-over.

---

[27] A related doctrine, judicial estoppel, "generally prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase." *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001); *see also Intellivision v. Microsoft Corp.*, 484 F. App'x 616, 621 (2d Cir. 2012) (summary order) (explaining that "a prior inconsistent representation made in a prior phase of the same case can trigger judicial estoppel"(emphasis omitted)). Krause does not rely on this doctrine here and so we need not decide whether it applies. But we underscore that Defendants' shifting positions here directly implicate the policy concern underlying judicial estoppel—the need to "protect the integrity of the judicial process by prohibiting parties from deliberately changing positions according to the exigencies of the moment." *New Hampshire*, 532 U.S. at 743.

## CONCLUSION

In sum, we have considered all of the many arguments made by Defendants in their appeal of the judgment entered on this jury verdict. For the reasons explained above, we conclude that the jury's verdict was supported by sufficient evidence; that Defendants have not shown any error in the amount of damages awarded to Krause; and that any errors that the District Court made during the trial did not prejudice Defendants or render the trial unfair. We therefore AFFIRM the judgment of the District Court.

RICHARD J. SULLIVAN, *Circuit Judge*, dissenting:

Because I believe that the district court's erroneous instruction regarding New York Education Law § 4402 ("section 4402") alone constitutes reversible error, I would vacate the judgment of the district court and remand this case for a new trial. Such reversal is especially appropriate here, where the district court compounded its error by allowing the jury to consider speculative hearsay statements concerning the motives of Superintendent Kelahan, and by admitting irrelevant and prejudicial evidence of unrelated complaints made over a year after Krause had been terminated.

The majority concedes that the district court erred when it instructed the jury that section 4402(3)(b)(ii) also applied to individualized accommodation plans under section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794(a). Maj. Op. at 38–39. It insists, however, that the error was harmless because it is "improbable that the jury was substantially swayed by the court's brief comment." *Id.* at 39.

But the district court's erroneous instruction was not a mere slip of the tongue on some inconsequential issue. The school district's principal defense at trial was that it fired Krause for a legitimate, nondiscriminatory reason – namely, that she violated applicable law and school district policy by modifying a section

504 plan without involving the section 504 committee. This argument hinged on the fact that a 504 accommodation plan is unlike an IEP, and may be modified only after a full 504 team "convene[s] to modify the 504 plan." New York City Dep't of Educ., Regulation No. A-710, "Section 504 Policy and Procedures for Students" (Sept. 10, 2021). In contrast, section 4402(3)(b)(ii) permits changes to a student's IEP without a Committee of Special Education meeting if the parents and school district agree. Defendants' counsel attempted to establish this point by introducing section 4402(3)(b)(ii) for the purpose of demonstrating that it *did not* apply to section 504 accommodation plans. But the district court wrongly instructed the jury that it had "heard the law concerning the [section] 504 [plan]," J. App'x at 1236, falsely implying that the requirements of section 4402 and section 504 were identical. This erroneous jury instruction clearly undercut Defendants' contention that Krause was fired for a legitimate, nondiscriminatory reason based on her failure to comply with the school district's policy concerning the modification of a section 504 plan. *See United States v. Brennan*, 650 F.3d 65, 93 (2d Cir. 2011).

The district court's incorrect instruction was compounded by arguments made by Krause's counsel to the jury in her opening statement and in summation

regarding section 504 plans. *See, e.g.*, J. App'x at 1113 (arguing that Defendants' purported reliance on the section 504 plan modification as the basis for Krause's termination was pretextual and that "Defendants [were] not willing to take responsibility for not following the laws and the regulations under New York State Education Law"); *id.* at 1371 (contending that Defendants' interpretation of section 504 would effectively discriminate against students with section 504 accommodations). By giving the erroneous instruction during the trial and then refusing to include a proposed corrective instruction in its final charge, the district court left the jury with the false impression that section 4402 applied to both IEPs and to 504 accommodation plans and invited the inference that Defendants' proffered nondiscriminatory reason for firing Krause was unfounded and pretextual. J. App'x at 1861–96. Since it generally "must be assumed that the jury follow[s] instructions," *Tesser v. Bd. of Educ. of City Sch. Dist. of N.Y.C.*, 370 F.3d 314, 320 (2d Cir. 2004) (internal quotation marks omitted), the district court's error was far from inconsequential.

While the district court's erroneous jury instruction was alone sufficient to warrant a new trial, I also believe that the district court made a series of other errors that further undermined the fairness of the proceeding for Defendants.

*First*, the district court abused its discretion when it allowed the jury to hear numerous out-of-court statements made by secretaries Terese Sojda and Kathie Higgins to another secretary, Colleen Zumbrun, concerning their belief that Kelahan would not have treated Krause the way he did if she were a man. *See, e.g.*, J. App'x at 1172–74. In addition to being highly speculative – neither the district court nor Krause offered any explanation for how the secretaries could have known what Kelahan's reaction would have been had the principal been a man – these inflammatory remarks were clearly out-of-court statements offered "to prove the truth of the matter asserted in the statement." Fed. R. Evid. 801(c).

As an initial matter, this argument was not forfeited. Defendants raised this argument as a full (though short) section in their post-trial motion, noting the centrality of this improperly-admitted evidence to Plaintiff's main theory of the case and contending that the evidence was "clearly reversible error." Defendants' Memorandum of Law Supporting Combined Post-Trial Motions at 3, *Krause v. Kelehan*, No. 6:17-cv-1045 (LEK) (N.D.N.Y. Nov. 8, 2021), Dkt. No. 175. As Defendants properly raised this argument to the district court, we should not consider it forfeited. *See In re Nortel Networks Corp. Sec. Litig.*, 539 F.3d 129, 132 (2d Cir. 2008).

4

On the merits, the district court incorrectly concluded that these statements were admissible under Federal Rule of Evidence 801(d)(2)(D) simply because the secretaries were "employees of the defendants," J. App'x at 1172–73, without considering whether the statements "relate[d] to a matter within the scope of the [employer-employee] agency," *Walsh v. N.Y.C. Hous. Auth.*, 828 F.3d 70, 79 (2d Cir. 2016) (internal quotation marks omitted). In fact, the record makes clear that Sojda and Higgins had no "authority to take action about which the statements relate," *i.e.*, Kelahan's conduct or Krause's performance. *Pappas v. Middle Earth Condo. Ass'n*, 963 F.2d 534, 538 (2d Cir. 1992); *see also Walsh*, 828 F.3d at 79 (requiring that the declarant be an "advisor or other significant participant in the decision-making process that is the subject matter of the statement"). Moreover, there is every reason to believe that this error "affected the outcome of the case," *Tesser*, 370 F.3d at 319 (internal quotation marks omitted), since the statements could not otherwise have been introduced given that Sojda and Higgins denied making these comments on direct examination, and Krause's counsel referred to these statements during her summation to the jury. In short, the district court's ruling permitted the jury to speculate as to Kelahan's discriminatory intent through the unsworn testimony of out-of-court speakers.

5

*Second,* the district court erred in admitting complaints that Zumbrun lodged with the Board of Education that had nothing to do with Krause's asserted claims of gender discrimination. To be admissible, evidence must be "relevant," which means it must have a "tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." *United States v. Malpeso,* 115 F.3d 155, 162–63 (2d Cir. 1997) (quoting Fed. R. Evid. 401); *see also* Fed. R. Evid. 402. Here, Zumbrun's complaints to the Board related to the purportedly "hostile, un-peaceful work environment stemming from power hungry people" at the school, the "unprofessionalism that was going on at the district," and the behavior of Melissa Lowell, the school district's section 504 plan committee chair. J. App'x at 1176, 1498–99. Notably, these complaints contained "no reference to gender," *id.* at 1178, and Zumbrun herself admitted that she "[did not] believe" that the hostile environment at the school had anything to do with the fact that "[she] was a woman[]," *id.* As such, this evidence was not relevant to the gender-discrimination claims brought by Krause. *See* Fed. R. Evid. 402. In essence, the district court permitted Krause to introduce this evidence as proof of Defendants' propensity to condone hostile work environments generally, which

6

was not a permissible basis for introducing the evidence and likely contributed to the jury's ultimate finding of liability on Krause's hostile work environment claim.

When combined with the erroneous jury instruction concerning the applicability of section 4402 to 504 accommodation plans, these errors cannot be dismissed as trivial miscues that had no effect on the jury's ultimate verdict.

*     *     *

For all these reasons, I disagree with the majority's conclusion that the asserted trial errors were not severe enough to substantially sway the jury. Accordingly, I would vacate the judgment of the district court and remand for a new trial.